# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 18, 2010 Session

## REGINALD DENARD USHER, SON OF REGINALD SMITH, DECEASED v. CHARLES BLALOCK & SONS, INC. ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 1-245-04      Dale C. Workman, Judge**

**No. E2009-00658-COA-R3-CV - FILED JUNE 30, 2010**

Reginald Smith ("the Decedent") died when the exposed metal edge of a device known as a "Guardrail Energy-Absorbing Terminal" ("the crash cushion") penetrated the window of the cab of his moving overturned tractor-trailer and cut him nearly in half. His son, Reginald Denard Usher ("the plaintiff"), filed this action in the trial court against Charles Blaylock & Sons, Inc. The plaintiff also filed a claim against the State with the Tennessee Claims Commission. The essence of the claims is that the crash cushion was negligently placed at the end of a series of concrete barriers that served to separate traffic entering on and exiting from the roadway connecting to the temporary end of Interstate 140 in Blount County. The alleged negligence was the failure to install a "transition panel" between the last concrete barrier and the crash cushion. Such a panel is designed to cover the otherwise exposed edge of the crash cushion thereby preventing vehicles from "snagging" the exposed metal edge. Eventually, the claim against the State was joined with the claim against Blaylock. The case was tried to a jury with the circuit judge sitting as the Claims Commissioner; the jury was utilized by the trial judge in an advisory capacity with regard to the claim against the State. The jury returned a verdict in favor of the plaintiff. The jury found that the plaintiff's total damages were $2,000,000. It apportioned fault 25% to the Decedent, 37.5% to the State, and 37.5% to Blaylock. Acting as the Claims Commissioner, the trial court went against the advice of the jury and dismissed the claim against the State. The court found (1) that the plaintiff failed to carry the burden of proof with respect to the applicable standard of care for installing crash cushions; (2) that the plaintiff failed to prove a breach of duty; and (3) that, in any event, the Decedent was at least 50% at fault for speeding through a construction zone in foggy conditions. Later, the trial court granted Blalock's motion for judgment notwithstanding the verdict and entered judgment in its favor. The court held (1) that Blalock was not responsible, as a matter of law, for leaving off the transition panel because the State's inspector on the scene "directed" Blalock to leave it off; (2) that the plaintiff failed to carry the burden of proving, by expert testimony, what a reasonably prudent contractor would have done under the circumstances; and (3) again, that the Decedent was

at least 50% at fault. The court, acting as 13th juror, conditionally granted Blalock a new trial in the event the judgment in its favor was vacated or reversed. The plaintiff appeals. We affirm the judgment in favor of the State. We vacate the judgment in favor of Blalock and remand for a new trial as to that defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in Part and Vacated in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Bo Bruner, Birmingham, Alabama; Sidney W. Gilreath, Bryan L. Capps, and Donna Keene Holt, Knoxville, Tennessee; and Charmaine Nichols, Sevierville, Tennessee; for the appellant, Reginald Denard Usher

Stephen C. Daves and Frank Q. Vettori, Knoxville, Tennessee, for the appellee, Charles Blalock & Sons, Inc.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael B. Moore, Solicitor General; and Dawn Jordan, Senior Counsel; Nashville, Tennessee, for the appellee, State of Tennessee.

**OPINION**

**I.**

**A.**

This single-vehicle accident occurred in a highway construction zone in the early morning hours of Friday, May 2, 2003. Blalock, a road contractor, was involved in a project to extend I-140 eastward from a point east of Alcoa Highway in Blount County. At the time of the accident, when I-140 (also referred to as Pellissippi Parkway) ended just west of Cusick Road – a road running perpendicular to the roadbed of I-140 – traffic entering I-140 at its temporary end as well as traffic exiting I-140 at that point shared a roadway ("the connecting roadway") off of I-140 to Cusick Road. As of the morning of May 1, 2003, the day before this accident, a line of concrete median barriers divided eastbound and westbound traffic on the connecting roadway. As of the morning of May 1, 2003, a crash cushion was attached to the end of the series of concrete median barriers as they neared Cusick Road.

The crash cushion is central to this dispute. Exhibit 3 in this record shows such a device *attached* to the end of a concrete median barrier. *See* Figure 1.



Figure 1.

The circle on Figure 1 was added by us. The circled device is called a "transition panel." Unlike the crash cushion shown in Figure 1, the crash cushion at the time of the

subject accident was *without* a transition panel to bridge the gap between the end of the last concrete barrier and the crash cushion.

The crash cushion was manufactured by Energy Absorption, Inc. A company document introduced into evidence describes the basic concept underlying its use:

> The [Guardrail Energy-Absorbing Terminal] System is a redirective, non-gating attenuator system. It safely decelerates a wide range of vehicles for design speeds up to 113 km/h (70 mph). When hit head-on, the system's Hex-Foam cartridges crush to dissipate the energy of impact, while the steel fender panels telescope. Only the cartridges and plastic nose are expended. When impacted from the side, the system safely redirects the vehicle, preventing it from gating through and causing secondary accidents.

The purpose of a crash cushion is to protect traffic approaching the end of the concrete barrier from the blunt trauma of hitting the exposed end of the barrier. A crash cushion is more sophisticated than a simple guardrail. It is designed to absorb some of the force of impact and to deflect the crashing vehicle. The parallel rails of the crash cushion visible in Figure 1 are joined at the front end of the cushion, in this case the end toward Cusick Road, by a cover that roughly resembles the shape of a horseshoe. The cover is designed to protect vehicles from what would otherwise be exposed ends of the rails. The barrier end or "rear" of the crash cushion, according to the manufacturer's instruction manual, can be handled in one of two ways. "At bi-directional sites (traffic traveling on both sides of the unit) the rear of the unit must be either offset away from the traffic approaching from the rear of the unit or *be installed with a transition panel to prevent snagging of vehicles*." (Emphasis added.) If the former is chosen, the rail must be set in from traffic to the point that the outside edge of the rail corresponds roughly to the side of the concrete barrier. If the transition panel, referred to sometimes as the wing or transition wing, is used, the panel or wing is bolted directly to the barrier and the rail of the crash cushion as reflected in Figure 1. At the urging of the trial judge, Blalock stipulated that the installation of the crash cushion must be done in accordance with the instruction manual of the manufacturer.

The task at hand for Blalock on the morning of May 1, 2003, (before the accident in the early morning hours of May 2, 2003) was to move 800 feet of the concrete median barrier separating traffic on the connecting roadway. The 800 feet of concrete barrier to be removed was that closest to Cusick Road. By approximately 2:00 p.m., the 800 feet of barrier had been removed from the connecting roadway leaving in place a section of barrier on that roadway beginning at the end of I-140. The crash cushion which had been attached to the

end of the barrier nearest Cusick Road was disengaged from the last concrete barrier and moved some 800 feet west to the new end of the exposed concrete barrier. Significantly, the decision was made to leave off the wing or transition panel. This left the end of one of the rails of the crash cushion facing eastbound traffic exposed and jutting out away from the concrete barrier appoximately12 to 18 inches.

There were no eyewitnesses to the accident that killed the Decedent. It is known that he was eastbound on I-140 in the direction of Alcoa with 40,000 pounds of butter in his tractor-trailer. In the early morning hours of May 2, 2003, a motorist happened upon the scene and found the Decedent dead in the cab of his tractor. The tractor was laying overturned with the driver's side resting on the road surface. The exposed metal rail of the crash cushion had penetrated the window of the cab and the Decedent's body. The sharp edge of the metal rail cut the Decedent almost in half. Figure 2 shows the metal rail of the crash cushion protruding into the cab of the Decedent's vehicle. The photograph was taken looking west back toward I-140.



Figure 2.

Figure 3 is a photograph of the accident scene looking down the roadway toward Cusick Road, the direction in which the Decedent had been proceeding. Grading for the extension of I-140 can be seen in the left top portion of Figure 3. Cusick Road runs generally parallel to the tree line at the top of the photograph. The Decedent's overturned trailer can be seen in the top right of the photograph.



Figure 3.

The motorist mentioned above reported the accident by a call to 911 at 3:33 a.m. on May 2, 2003. Sergeant Bud Cooper of the Alcoa Police Department responded. He had passed by the site at approximately 3:30 p.m. on Thursday, May 1, 2003, some 10-12 hours or so before the accident. On that occasion, he had made a mental note of the missing deflector wing or transition panel. Cooper testified that he said to himself that the exposed rail without the transition panel could "rip [a] vehicle open like a can opener would" and had the makings of "a very ugly accident." Cooper worked until 2:00 a.m. on May 2, 2003. He encountered some patchy fog as he drove home at the end of his shift but the record does not reflect where in Blount County he drove through the patchy fog or where the fog was in relation to the accident scene. The record does reflect that Cooper lived less than 5 miles from the accident site and that, on the way to the accident site after the 911 call, he drove

-6-

through "very thick" fog. Because of the fog, Cooper drove from his home to the accident scene at about 20 to 25 miles per hour. When he arrived at the accident scene, he had trouble seeing with his flashlight because of the fog.

Cooper took photographs and measurements and performed an accident reconstruction. He testified at trial about the results of his work. One of the photographs is Figure 2; it shows the headlights on the overturned tractor still burning, on high beam. According to Cooper, the Decedent lost control of his vehicle 765 feet west of the point where it came to rest. The vehicle traveled east out of control for 261 feet where the tractor struck the concrete median barrier. Some 71 feet further east along the barrier, the trailer jumped the barrier, and the vehicle slid along the concrete barrier with the tractor or one side and the trailer on the other. Approximately 165 feet away from the end of the barrier, the tractor turned onto the driver's side and continued sliding toward the crash cushion. Once the tractor hit the crash cushion, which itself weighed approximately 2,000 pounds, it pushed the crash cushion 114 feet to the east before coming to rest.

Cooper testified that, in his opinion, the Decedent was traveling at 81 to 86 miles per hour when he lost control of his truck. The plaintiff's expert, David Brill, estimated that the Decedent was traveling at the lesser rate of 63 to 71 miles per hour. Brill admitted basing his opinions on the photographs and analysis done by Cooper, but he disagreed with Cooper about the point of the vehicle's first collision with the barrier. In order to reach his conclusion, Brill had to use a later point of impact further east. Brill admitted on cross-examination that if the vehicle had been going 55 mph at the point the trailer rolled over the barrier and onto its side some 432 feet from the crash cushion, it would have stopped in 202 feet, approximately 130 feet short of the crash cushion. Brill testified that, after forming his opinions, he learned that the truck was equipped with a governor which restricted its speed to a maximum of 70 mph. Brill testified that his opinion was consistent with the vehicle being governed to a top speed of 70 mph. Defense expert Jack Humphries placed the speed at 75 to 80 mph.

Brill was further cross-examined with the complaint, which states "at said time and place . . . the weather was foggy." He acknowledged that 49 CFR 392.14 requires a driver of a commercial vehicle to use "[e]xtreme caution . . . when hazardous conditions, such as those caused by . . . fog . . ." exist. Brill admitted that if fog were present, the regulation required the Decedent to exercise extreme caution. Brill also admitted that the proper and prudent thing to do for a driver of a commercial vehicle, who encountered fog or construction signs, was to slow down. Brill testified that there were some things about the stretch of road that made it confusing but acknowledged on cross-examination that the critical speed – meaning the speed at which a truck could be driven through the site without overturning – was in the range of 100 mph.

-7-

The plaintiff conceded fault. As we have observed, the complaint explicitly alleged that "the weather was foggy" at "said time and place."[1] In his opening statement, counsel for the plaintiff stated:

> We're going to admit to you that he was going over the speed limit. Our best estimate . . . places the speed at between 63 and 71 miles an hour. It was a 55 mile an hour zone. He was going too fast.
>
> Now, you are going to hear some reasons about that road, why maybe this was a difficult road. There were other problems out there, but he was going to[o] fast. We acknowledge that. You are going to hear that it was a foggy night, that fog rolled in and out that evening. Nobody can say exactly what the fog was like at the time of the crash, because there are no eyewitnesses, but we acknowledge fog may have played a role in him losing control of the truck.

Michael Hutchins, a transportation technician for the Tennessee Department of Transportation ("TDOT") who was acting as the "eyes and ears" of the State, testified concerning the decision to place the crash cushion at the end of the concrete median barrier without the transition panel. Hutchins testified that he had worked for years with crash cushions and was familiar with regulations regarding the devices. Hutchins stated that Blalock and the State are subject to the same installation and safety rules with respect to crash cushions. Blalock is expected to have people on the job that are knowledgeable and have a degree of expertise with crash cushions. Blalock had the freedom to have as many people on the job as needed to complete the job correctly even if overtime pay would be necessary. According to Hutchins, Rick Dockery, the acting foreman for Blalock for the day, "asked us if we wanted to remove that [crash cushion], and if so, what to do with it." After some discussion, they collectively came to the conclusion "the best process for it would be to move it and put it to where we had stopped removing the barrier rails and place it at the end so it could absorb, if anybody was coming onto the [the connecting roadway from Cusick Road]. Instead of hitting the barrier rail head on, they would hit the [crash cushion] head on." It took Blalock approximately 45 minutes to move the crash cushion west to the new

---

[1]The plaintiff argues that statements made by counsel in opening do not constitute evidence. This is true. However, statements made in a pleading become evidence, as statements of the party, if they are introduced to the jury, as they were in this case. *See Conley v. Life Care Centers of America, Inc.*, 236 S.W.3d 713, 743 (Tenn. Ct. App. 2007). Further, we do not agree that the concessions of fault made to the trier of fact by counsel should be ignored.

end of the concrete barrier. Hutchins admitted that in their discussions, he and Rick Dockery were aware that the exposed end of the rail on the crash cushion posed a risk to passing eastbound motorists. They were also aware of a general increase in the risk of accidents in construction zones. Hutchins testified that Rick Dockery "asked if we wanted to install the wing or not, and I said no. I said we would come in the next day and move it, and I made a field judgment."

When Hutchins was questioned by counsel for the State, he stated that he only makes "suggestions" but does not give orders to contractors because he is without authority. Hutchins read into the trial record a portion of TDOT's standard specifications for road and bridge construction that limit the authority of inspectors: "Inspectors will not be authorized to revoke, alter, enlarge, or relax the provisions of the specifications, nor will they be authorized to approve or accept any portion of the completed project or to issue instructions contrary to the plans and specifications." Hutchins testified that the decision whether or not to move the crash cushion was not specifically addressed in the plans and specifications for the project. Hutchins denied ordering Blalock to either move the crash cushion from near Cusick Road or to leave it where it was at the time of the accident without the transition panel. His "suggestion" is one that Blalock did not have to follow. In response to questions posed by the State's counsel, Hutchins testified that the site was well marked with signs and reflective markings to the point that it should not have been confusing or hard to drive safely through the construction zone.

In response to questions from Blalock's counsel, Hudgins stated that he believed the crash cushion was safe without the transition panel. He noted that it provided some protection to traffic coming onto the connecting roadway from Cusick Road and was going to be moved anyway the next day – in a matter of hours. He also admitted that despite the language of Blalock's contract, he believed Blalock was following his "directives" and if he had wanted something else done with the crash cushion, Blalock would have done it.

In a brief redirect, Hudgins stated that the manufacturer came out the morning after the accident and made a permanent installation of the crash cushion, complete with transition panels. Also, he acknowledged that there was enough advance knowledge that either the State or Blalock could have made arrangements to have the manufacturer available to install the crash cushion at the new end of the concrete barrier prior to the time of the accident.

Plaintiff called Dale Dockery, concrete superintendent for Blalock and brother to Rick Dockery, as a witness.[2] Part of Dale Dockery's duties had been to install crash cushions. When Blalock installs a crash cushion, it is done in accordance with the manufacturer's

_____

[2]Rick Dockery did not testify.

installation manual. Dockery testified that in his experience with Blalock, he had never allowed a crash cushion to be installed without the transition panel. Dockery would never allow one to be installed without the panel. Even if the State gave permission to leave off the panel, Dockery would go the extra step of installing the panel. Dockery testified that he would certainly voice his concern if instructed or permitted to install the crash cushion improperly.

On cross-examination by Blalock's counsel, Dockery stated that he had never installed a crash cushion in a situation where it was only going to be in place temporarily. Dockery stated his opinion that "if the State inspector was asked by the Blalock employee do you want us to put the transition piece on, and the State inspector said no," then it was reasonable for Blalock "to follow that direction."

B.

After the jury announced its verdict, and the verdict was incorporated into a judgment against Blalock, the court held a hearing to consider argument and announce its findings as to the State. The court specifically found that it was foreseeable that leaving the crash cushion rail unguarded by a transition panel created a risk to motorists proceeding east on the connecting roadway – the direction in which the Decedent was proceeding. According to the court, it was not necessary for the State to foresee the exact circumstances of the collision in order for the State to be liable. Nevertheless, the court found that the plaintiff did not carry "the burden of proof to establish what a reasonably prudent person would have done in the same or similar situation as the State was in this case." Further, the court found that under the circumstances, the risk that the State chose to permit was not unreasonable compared to other risks that it avoided. In the eyes of the court, any decision that the State made generated some risk to some motorist or worker. For example, the crash cushion could have been left off and the risk to the Decedent could have been eliminated but a new risk to westbound motorists facing the blunt end of the concrete barrier would have been generated. Also, the installation manual called for the cushion to be anchored in addition to bolting on the transition wing, therefore, a technically complete installation "by the book" would have required additional work and risk to workers and motorists. Therefore, the court found that the State was not negligent. For the purpose of conducting a complete analysis, including comparative fault, the court considered whether Blalock was at fault. The court stated:

> It's undisputed in this case that the agent of Blalock spoke with the agent of the State on this day and specifically asked if they wish the extension put on this guardrail. That is the negligent act that the Plaintiff relies upon, the fact it's not on there. The case is sewed around it, the extension was on there, there was no

-10-

liability on this incident.  They asked and the State told them not to do it, said, "No, don't do it."

The court found this to be a situation where the contractor did not act contrary to the project plans.  The court found that the decision was therefore the State's and that once the State expressed it's decision that it did not want the deflector panel installed, Blalock had no right to act contrary to the State's wishes.  Therefore, the court found that Blalock was not negligent for the purposes of its comparative fault analysis.

The court then proceeded to consider the comparative fault of the driver, assuming that the State was negligent and assuming that any negligence in the decision to leave the deflector panel off the crash cushion was the State's rather than Blalock's.

So the Court thinks there was comparative fault that I must do, assuming I find that the act of the State was negligent.  So both of the acts were foreseeable and both combined caused the injury.

Comparing the factors set forth in the court opinions, what factors would the Court use in comparing fault and such other factors which are significant to the Court?

One, the fact that 49 CFR says what it does. We [are] talking about a condition of at least patchy, heavy fog, if not consistent fog.  We don't know exactly what the fog conditions were exactly at the incident and exactly at the scene, but the testimony was that the Officer, whether he was there an hour before the assumed time of the wreck, going off to work, that there was some but it was not this thick, and he was there within a few minutes after it was reported, this impact.  He probably gets there about 4:00.

We are assuming, that's the best we can do, I guess, that the wreck happened somewhere between 2:00 and 4:00 because the Officer was down through there at 2:00 and there was no wreck there.  So that's the best information I think we have, that there was some fog in the area.

-11-

He is required, under that Federal CFR Statute, to use extreme caution in that situation. So his duty of care is a little bit higher in that set of facts.

The second issue to be used to compare fault, that was the unusual nature of the injury. Assuming, again, not for the purposes of is it foreseeable, but one of the other things, the risk of this injury. The foreseeability comes back in, what were you doing and how much you could foresee whether the injury could occur from what you're doing. The Court finds that this unusual nature of what happened here at this wreck is so extremely rare, and that is another factor to be considered.

Thirdly, the conduct of the foreman that confronted the risk. He created a risk. He committed a negligent act, under this set of assumptions. That's one of the factors. What was he trying to achieve? Obviously, he was trying to achieve the reduction of some risk for somebody else, and that is a factor to be considered.

Fourth, confronting a risk. Who better knew of what risk occurred here, the foreman in the afternoon foreseeing what occurred versus him driving clearly on a foggy road at a very high rate of speed in a very heavy truck?

Last, the failure of the deceased to use the opportunity to slow down. Had he just been going 55-miles-an-hour, 60-miles-an-hour, as the State argues, everything else appears the same, he stops before he hits the guardrail.

Considering all of that, the Court finds – if the Court found that the act of negligence was a cause of the incident and was foreseeable, that at least 50 percent of the cause would be the cause of the deceased. So, therefore, the Court dismisses the case against the State of Tennessee.

The court incorporated its memorandum opinion into an order granting judgment in favor of the State.

C.

Later, the court held a hearing on Blalock's renewed motion, originally made and denied at the end of the plaintiff's proof and again at the close of all the evidence, for directed verdict or new trial pursuant to Tenn. R. Civ. P. 50.02.[3] Blalock incoporated the trial court's opinion granting judgment in favor of the State into its renewed motion, and the court's opinion was understandably a subject of discussion at the hearing. The court clarified its previous ruling as follows:

> Maybe I didn't say it clearly, but what I tried to identify in that is the issue, we have a lay jury. It's not like a car wreck case.

> Can a lay jury without direct proof, I'm an expert in the methods of construction, and in the methods of construction a reasonably prudent person would consider this risk, that risk and the other risk, and this is the choice or the choices that reasonable prudent person can make within the standard of not being negligent. Is that necessary is what I tried to set up, because I don't think that was presented in this case in that way.

> And so that's what I tried to say in that opinion, maybe inartfully, that the plaintiff did not have a witness who says, I

[3] Tenn. R. Civ. P. 50.02 states:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 30 days after the entry of judgment a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict; or if a verdict was not returned, such party, within 30 days after the jury has been discharged, may move for a judgment in accordance with such party's motion for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

-13-

am an expert in knowing what supervisors and people on the job do on a day-to-day basis, and on a day-to-day basis you have these risks and that a reasonable person could without being negligent decide to do A, B, and C.

Ultimately the court announced its ruling as follows:

I'm supposed to decide the issues and then what we used to call the wayside. Now they call it an alternative, I think. . . . .

It all comes down – this one is much, I think, clearer than the state's case is, if anything. I don't think that in this case you ever reach the issue of comparative fault, because if I'm right on the first issue you never get there.

Should the contractor be liable when the owner of the property in this case the state says and they asked you, do you want us to put that extension on this guardrail? And they were told, no, don't do it. And with that the one who's responsible for that decision if it's wrong has to be only the state.

The contractor can't run the State of Tennessee. The contractors can't decide what the conditions will be on an owner's piece of property contrary to the interest of the owner. That just cannot be the law in this state, and for that reason the court is going to direct the verdict dismissing the case against the contractor for that reason only that under the set of facts in this case that they could not be liable because they did nothing negligent other than doing what they were told to do, and they don't have the right to trump the direction of the state employee not to put the extension on, which is the sole issue of liability in this case.

As necessary as the supplemental or alternative finding, then we get into all the other things and the rest of the opinion about whether there was proof about the standard of care or not one way or the other, the proof about comparative fault and all those other things, which are alternatives to the – I guess you could say as to whether the Court should reverse the verdict because it's not supported by the evidence if you want to address that issue that way and state it separately.

-14-

Then the third one is the 13th juror. Considering what I said as the 13th juror, I would not approve this verdict against the contractor.

The trial court incorporated both the memorandum opinion as to the State's liability and its memorandum opinion as to Blalock into the judgment entered in favor of Blalock.

## II.

The plaintiff has appealed raising the following issues, as restated by us:

Whether the trial court erred in concluding that Balock was relieved of responsibility as a matter of law by the State's decision that it did not want the deflector wing installed on the crash cushion.

Whether the trial court erred in requiring expert proof of the standard of care.

Whether the trial court erred in finding that reasonable minds would necessarily conclude that the Decedent was at least 50% at fault.

Whether this court should disregard the trial court's grant of a new trial and reinstate the verdict.

Whether the evidence preponderates against the dismissal of the claim against the State.

## III.

This Court will review the trial court's conclusions of law *de novo* with no presumption of correctness accorded to the trial court's legal judgments. ***Union Carbide Corp v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993). With respect to directed verdicts, the standard of review is as follows:

In ruling on such a motion, the standard applied by both the trial court and the appellate court is the same as that applied to a motion for directed verdict made during trial. Therefore, the trial court and appellate court are required to take the strongest

-15-

legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 130-31 (Tenn. 2004)(citations omitted). When a trial court grants a motion for directed verdict and also conditionally grants a new trial as 13th juror, and this Court reverses the directed verdict, we should normally remand for a new trial. *Holmes v. Wilson*, 551 S.W.2d 682, 687 (Tenn. 1977). As stated in *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694 (Tenn. Ct. App. 1999):

The thirteenth juror rule requires the trial court to weigh the evidence independently, to determine the issues, and to decide whether the verdict is supported by the evidence. Although we may consider any comments made by a trial judge during a hearing on the motion for new trial, we must, in the final analysis, determine whether the trial court properly reviewed the evidence and agreed or disagreed with the verdict. We cannot review the accuracy of the trial court's determination as thirteenth juror.

*Id*. at 717-18 (citations omitted).

When the trial judge acts as a trier of fact, as he does when acting as Claims Commissioner, our review of factual findings is *de novo*, upon the record with a presumption of correctness unless the evidence preponderates against the Commissioner's findings. Tenn. R. App. P. 13(d); *Cross v. City of Memphis*, 20 S.W.3d 642, 644-45 (Tenn. 2000). If the evidence preponderates against the trial court's findings, we are empowered to weigh the evidence and determine the appropriate outcome according to the preponderance of the evidence. This extends to allocating fault if necessary. *Keaton v. Hancock Count Bd. Of Educ.*, 119 S.W.3d 218, 225-26 (Tenn. Ct. App. 2003). Still, we review the trial court's legal conclusions *de novo*, with no presumption in favor of the court's legal conclusions. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

Obviously the claim against the State was tried to a different trier of fact than the claim against Blalock and the standard of review is vastly different. Far more deference is

accorded a jury's findings. Therefore, in this opinion it is especially important to consider whether we are dealing with a finding of fact and who made the finding.

We begin with the trial court's handling of the claim against Blalock. The first issue is directed at the trial court's legal conclusion that Blalock could not be held liable because it did what it did at the direction of the State. As the plaintiff points out, there are really two aspects to this holding – one of fact and one of law. Whether the State directed that the transition panel be left off or simply suggested that it be left off was a factual inquiry for the jury. Under the directed verdict standard, this inquiry should have been left to the jury unless reasonable minds only could conclude that the State directed the deflector wing to be left off, leaving Blalock no choice in the matter. *Mercer*, 134 S.W.3d at 130-31. There was evidence in this case from which a reasonable juror could reach the conclusion that Hudgins was making a "suggestion" and not directing Blalock to leave off the transition panel. Under any version of the evidence, it is clear that discussion from Blalock was welcomed when the question about what to do with the crash cushion came up. Hutchins testified that he, after discussion, made a "field judgment" but he also specifically denied giving Blalock "orders." Hudgins conceded at one point that he believed Blalock was following his "directives," but at another point stated that he, Hudgins, was only giving suggestions which Blalock was free to ignore. Also, the jury was given proof that the contract reserved certain rights to the contractor, despite what an inspector may order. Further, the testimony of Dale Dockery was to the effect that he had never installed a crash cushion without deflector shields and that he would question any order or suggestion to do so. In short, there was material evidence upon which reasonable minds could conclude that the State did not take the decision out of Blalock's hands. Under the law, this was the jury's call. There was material evidence to support a verdict in favor of the plaintiff on this issue.

The trial court's legal conclusion that Blalock could not be liable for a decision that was reserved to the State appears to be based (1) on the factual finding that Blalock had no choice or input into the matter, which we have already held was a matter that the jury could have resolved against Blalock and (2) the trial court's sense of what the law should be, absent any guiding case law. The trial court observed as follows:

> The contractor can't run the State of Tennessee. The contractors can't decide what the conditions will be on an owner's piece of property contrary to the interest of the owner. *That just cannot be the law in this state*, and for that reason the Court is going to direct the verdict dismissing the case against the contractor.

(Emphasis added.) The only case Blalock has produced to support the trial court's ruling is ***Wood v. Foster & Creighton Co.***, 235 S.W.2d 1 (Tenn 1950). In ***Wood***, the contractor

-17-

excavated according to grade and survey stakes set by the state engineer. *Id*. at 2. Unfortunately, the excavation, which included sloping a bank, disturbed private property including some shade trees. The private landowner filed suit against the contractor and the city that was supposed to have secured a construction easement. *Id*. The trial court held in favor of the city and held the contractor liable. On appeal to the Supreme Court, the judgment was reversed with the result that the city was held liable for "taking" the property and the contractor was absolved of liability. *Id*. at 4. The rule the High Court followed in holding that the contractor was not liable was stated as follows:

> It is a well settled rule in this State that a contractor constructing a public improvement for a public authority is not liable to a private property owner for the resulting damage where the contractor acts in accordance with the public authority's orders and is not itself guilty of negligence in the manner in which it does the work.

*Id*. at 3. Blalock has been unable to supply a case applying the holding of *Wood* to a personal injury on a highway construction project. We readily see two points that distinguish the present case from *Wood*. First, *Wood* was a property damage (taking) case instead of a personal injury case. It is one thing to hold that a contractor can blindly follow a public authority's wishes (or orders) without incurring liability to an adjoining landowner, but a far different thing to hold that a contractor can create or allow a lethally dangerous situation to exist on a highway without incurring liability just because the sovereign body makes an unwise and unsafe suggestion or decision. Second, the facts in *Wood* showed that the contractor was not negligent, whereas in the present case the jury determined that Blalock was negligent. In *Wood*, the contractor had "no discretion." *Id*. In the present case we have already determined that a jury could, and apparently did, conclude that Blalock retained some discretion.

The plaintiff argues that this case is controlled by *Johnson v. Oman Const. Co.*, 519 S.W.2d 782 (Tenn. 1975), and that the trial court erred in not following *Johnson*. *Johnson* is a wrongful death case filed by the parents of their son killed in single vehicle accident when he drove his automobile into a guardrail. *Id*. at 784. The guardrail was erected as a barricade by the defendant contractor on what had been a through street. The complaint alleged that the municipality where the street was located and the contractor, among others, were negligent in failing to give a warning to motorists of the guardrail's location. *Id*. The Supreme Court held that the complaint stated a cause of action against both the municipality and the contractor. *Id*. at 789. The High Court deemed any and all allegations in the complaint to the effect that the contractor had departed from the contract specifications to have been overcome by an affidavit in the record, therefore the Court treated the case as "one

-18-

in which [the contractor] had satisfactorily and correctly performed its work according to the contract documents and specifications." *Id*. at 787. The facts that stated a claim, if any, were

> to the effect that the barricade, as constructed, was not properly illuminated or painted so as to be visible to motorists, particularly in darkness or other adverse driving conditions. The complaint does allege that the acts of [the contractor] in thus erecting such a barricade constituted proximate negligence, resulting in the death of the decedent.

*Id*. The Court also treated the complaint as supporting the inference that the contractor knew or should have known that the barricade was dangerous to motorists. *Id*. With this factual predicate, the Court considered "whether or not the completion of the work and its acceptance by the owner automatically, and as a matter of law, discharged [the] . . . independent contractor . . . from liability to third parties, assuming negligence on the part of [the contractor] can be established as alleged." *Id*. at 788. The Court overruled cases upon which the contractor relied, stating as follows:

> We are of the opinion, however, that the older rule, discharging the independent contractor automatically and as a matter of law in all situations, upon the acceptance of his work, is not the better view. In our opinion, if an independent contractor is guilty of negligence in performing his work in such a way that it could reasonably be foreseen that the owner or third parties would probably sustain personal injury or property damage as a result of the negligent condition, then the independent contractor should not, as a matter of law, be discharged merely because his work has been accepted and delivered to the owner.

*Id*.

We agree with the plaintiff that the rule in *Johnson* is broad enough to control this case. We also agree with the plaintiff that if the final inspection and acceptance of work by a sovereign owner is not enough to absolve a contractor of liability, it would not be logical

to hold that an aberrant "order," given as a matter of "field judgment" on the spur of the moment[4], that creates a condition the contractor should have known was dangerous, would be given greater deference. The fact that the sovereign accepted or approved of or ordered the condition is not irrelevant. "Certainly a contractor may point to the inspection and acceptance of his completed work by a sophisticated and conscious owner as being a circumstance bearing upon the reasonableness of the conduct of the contractor." *Id*. Blalock did just that in this case and convinced the jury to apportion 37.5% of the fault to the State. Accordingly, we hold that the trial court erred in directing a judgment in favor of Blalock on the ground that the State's decision not to install the panel relieved Blalock of liability.

We next consider whether the trial court erred in holding that the plaintiff was required to produce expert testimony of the standard of care of a road contractor. As explained by the court in the hearing on Blalock's post-trial motion, this was part and parcel of its alternative holding that the plaintiff did not carry the burden of proving that Blalock was negligent. We also believe that it was part and parcel of its reasoning in holding that the plaintiff did not carry the burden of proving the State was negligent. We will deal with the particulars of that analysis later, but for now we reiterate that in granting a judgment to Blalock, the trial court referred back to its memorandum opinion in favor of the State and noted that "what I tried to say in that opinion, maybe inartfully" was that an expert was needed to say what risks a reasonable person would accept and what risks were not acceptable.

The general state of the law as concerns "the required use of expert testimony" was clearly stated in *Miller v. Willbanks*, 8 S.W.3d 607 (Tenn. 1999) as follows:

> The mere availability of expert proof does not give rise to a corresponding obligation that it be used. Rather, expert testimony is necessary only when the subject of examination requires knowledge or experience that persons lacking special skills do not have and that cannot be obtained from ordinary witnesses. If the finder of fact can comprehend the subject of expertise without expert testimony, then an expert witness is not necessary.

[4]We understand that the plaintiff presented evidence that the State and Blalock had plenty of advance knowledge that the crash cushion near Cusick Road would be moved. Blalock and the State, however, presented the case as an unusual variance from expected conditions, not covered in the contract, that had to be handled in the field.

*Id*. at 615(citations omitted). The conclusion in *Miller* was that a lay juror is competent without expert testimony to decide whether a party has sustained a mental injury in cases of intentional infliction of emotional distress. *Id*.

Blalock concedes that the trial court required expert proof of the plaintiff, but argues that this is the type of case that requires expert proof. Blalock argues that "[r]equiring expert testimony on the standard of care is not limited to professionals such as doctors and lawyers." Blalock relies on *Walker v. Arrow Exterminators, Inc.*, No. 01A01-9809-CV-00492, 1999 WL 722639 at *3 (Tenn. Ct. App. M.S., filed Sept. 17, 1999) and *Keebler v. Wilson*, No 03A01-9310-CH-00375, 1994 WL 116074 (Tenn. Ct. App. E.S., filed April 7, 1994). We note that under Supreme Court Rule 4(E), *Keebler* is not entitled to any precedential value and should not even have been cited. The *Keebler* opinion was challenged by an application for permission to appeal which the Supreme Court denied "[c]oncurring in [r]esults only." It is telling that the only cases Blalock could produce are one that should not have been cited and another that has nothing to do with road conditions.

The plaintiff relies on *Lawrence County Bank v. Riddle*, 621 S.W.2d 735 (Tenn. 1981) and *Cocke County Bd. Of Commissioners v. Newport Utilities Bd*, 690 S.W.2d 231 (Tenn. 1985) as well as the general body of law applicable to dangerous conditions on state roadways for the proposition that a layman can determine whether it was negligent to leave the metal end of a guardrail exposed to approaching traffic. We agree with the plaintiff. *Lawrence* held that expert testimony was not necessary to support the jury's determination that a contractor and the public utility that hired the contractor were negligent in leaving a ditch open over a weekend of heavy rain with resulting flooding into the bank. The contractor intended to backfill the trench as soon as the electric utilities company installed the conduit. The High Court held that "the digging of an open trench and the consequences of leaving it open for several days is a matter within the knowledge and understanding of ordinary laymen." *Id*. at 737. Much of the force of Blalock's argument is premised on the proposition that only an expert in road building would know that you do not engage all the normal safety measures against a danger that will be temporary. Given that the ditch in *Lawrence County* was only to be temporary, until conduit was installed, we believe the logic of *Lawrence County* applies.

In the *Cocke County* case, the "issue before the trial court was whether roads which had been cut . . . were returned to the condition they were in prior to excavation." *Id*. at 235. The trial court rejected plentiful expert testimony presented by the excavating contractor and credited lay testimony on the condition of the roads, ultimately ruling against the contractor. *Id*. The Supreme Court held that the subject was "within the ken of ordinary laymen." *Id*.

There is no dispute in this case that Blalock was held to the same standards and regulations as the State. The duty owed by the State, and in this case Blalock, is

> to exercise reasonable care under all the attendant circumstances in planning, designing, constructing and maintaining the State system of highways. *See*, Tenn. Code Ann. Sec. 9-8-307 (a)(1)(I). The State owes this duty to persons lawfully traveling upon the highways of Tennessee.

*Goodermote v. State*, 856 S.W.2d 715, 720 (Tenn. Ct. App. 1993). "The core of negligence is . . . engaging in behavior which should be recognized as involving unreasonable danger to others." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008)(citations and internal quotation marks omitted). "The term reasonable care must be given meaning in relation to the circumstances. Reasonable care is to be determined by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury." *West v. East Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005). Thus, if the proof was sufficient to allow the jury to understand the risk of injury posed to the Decedent from leaving the transition panel off the crash cushion, versus the burden and risk of installing the panel, this case falls within the logic of *Cocke* County and *Lawrence County*, and outside the cases upon which Blalock relies.

Upon reviewing the evidence, we hold that it was sufficient to allow the jury to determine the standard of care applicable to Blalock. Practically all the witnesses at trial acknowledged that the reason transition panels are installed on crash cushions is to protect motorists approaching from the rear from the grave danger of death or serious injury when "snagged" by the unshielded rails. Blalock stipulated that installation must be in accordance with the instruction manual supplied by the manufacturer, which manual required the panels to be installed. Blalock's concrete foreman testified that he had never installed a crash cushion without installing the transition panels. Also, the jury heard numerous times that the crash cushion was only going to be in place a short time. However, it also heard that on the same day as the accident, the State was able to have the cushion installed by the manufacturer, complete with the transition panels. Hudgins, the State inspector, admitted that the panels could be installed quickly, probably in a matter of minutes. The jury was also made aware of risks associated with the installing of panels on an otherwise incomplete crash cushion. Witnesses testified about the danger that the crash cushion, if not anchored at the front in concrete or compacted soil, could be knocked into oncoming traffic by a crash to the rear. In short, the jury had sufficient evidence to give meaning to the term "reasonable care" under these particular circumstances. Accordingly, we hold that it was error for the trial court to require the plaintiff to present expert testimony of the standard of care and error to

direct a verdict in favor of Blalock on the ground that the plaintiff did not carry the burden of proving Blalock was negligent.

We now consider whether the trial court erred in holding that no reasonable jury could conclude that the Decedent was less than 50% at fault. Since the trial court made its finding of comparative fault both as a finder of fact with regard to the claim against the State, and as a matter of law with regard to the claim against Blalock, we are going to undertake to merge the directed verdict analysis with our review of the trial court's factual finding as Claims Commissioner that the Decedent was at least 50% at fault. This will require us to compare and contrast the evidence, looking through the eyes of two different triers of fact, in light of the applicable standard of review for each. We realize that this approach is not without some risk of confusion, but we believe it will be less confusing than having two separate discussions of the Decedent's fault.

Before we embark upon this task, we think it important to reiterate a statement we made in ***Whaley v. Rheem Mfg.***, 900 S.W.2d 296 (Tenn. Ct. App. 1995):

> This Court does not sit as a jury of three to reweigh the evidence in jury cases. Once a jury, who has the opportunity of seeing and hearing the witnesses themselves, has determined the factual issues involved in a law suit and that determination has been approved by the Trial Judge, we may only review the evidence to ascertain if there is any credible evidence upon which that determination may be predicated. If there is, then even if we believe that the trier of fact has reached an erroneous decision, we must accept it. As is well known to all who practice before the appellate courts of this state, the burden of showing that there was no credible evidence to support a jury verdict is a massively heavy one to bear.
>
> However, this does not mean that we must passively sit by and allow patently impossible, incoherent, or perjured testimony to support a jury verdict. The rule is that . . . there must be some evidence which is capable of being believed by reasonable men, although we may not choose to believe it ourselves.

***Id.*** at 300 (*quoting* ***Lowe v. Preferred Truck Leasing, Inc.***, 528 S.W.2d 38, 41 (Tenn. Ct. App.1975)) (emphasis omitted). It should be readily apparent then that where we are reviewing conflicting determinations of fact by two separate triers of fact, one of which is a judge and the other of which is a jury, we could conceivably and logically disagree with but

sustain the jury's verdict as supported by material evidence, and also hold that the evidence does not preponderate against the trial court's finding.

We now focus on three findings: (1) The jury's finding as a matter of fact that the Decendent was 25% at fault for his own death; (2) The trial court's finding of fact as Claims Commissioner that the Decedent was at least 50% at fault; and (3) The trial court's finding that no reasonable jury could find the Decedent less than 50% at fault. We find material evidence to support the first finding, the evidence does not preponderate against the second finding, and the trial court erred as to the third.

Certainly the Decedent was speeding. The plaintiff conceded speeding in opening statement, but took the position that the Decedent's speed was in the range of 63 to 71 mph. There was expert testimony in support of that range from a witness, Brill, who testified that he made that determination long before he was ever retained as an expert. Brill also testified that the truck was governed to a maximum speed in the range of his opinion. Brill disagreed with the calculation of a greater speed because he disagreed with other experts about the first point of impact of the truck with an object to begin slowing its speed. In short, there was testimony upon which a reasonable person could conclude that the decedent was speeding but less than 10 mph over the posted speed limit of 55 mph. This could have played into the jury's findings as to how big a role the speed played in the outcome.

Just because we hold that a reasonable juror could have found for the plaintiff on the speed issue, does not necessarily mean that we *agree* with the jury's finding (first finding) and disagree with the trial court's finding as Claims Commissioner (second finding). To the contrary, we must also hold that the evidence does not preponderate against the trial court's determination that the Decedent was moving "at a very high rate of speed in a very heavy truck." The weight of the evidence is that the vehicle traveled over 700 feet after it went out of control. Much of that distance it was sliding on its side, part on one side of the concrete barrier rail and part on the other side. There is plentiful evidence that various parts of the tractor and trailer were digging into the road surface as it slid. Even the plaintiff's expert Brill had to concede that if the Decedent had just slowed to 55 to 60 mph by the point that the vehicle began to slide down the barrier rail, it would have slid to a stop well before it hit the lethal rail of the crash cushion.

Our analysis is similar concerning the fog issue. Regardless of what the trial court found as a fact, or what this Court may conclude as to the preponderance of the evidence, a reasonable juror could have concluded that the fog played only a minor role. The jury could have found that the fog had not settled in thick by the time of the accident and that the regulation concerning a commercial driver's obligation to use "extreme caution" was not triggered. There is nothing that pinpoints the exact time of the accident beyond debate. The

testimony was to the effect that at 2:00 a.m. the fog was patchy as Cooper made his way home from work. His route home is not detailed in the record. The fog was heavy when Cooper and the responders arrived at the scene of the accident after 3:33 when someone reported the wreck. The jury could have concluded that the accident happened closer to 2:00 than to 3:33. The jury could have viewed the fact that the headlights of the vehicle were found on high beam as more consistent with light, if any, fog rather than heavy fog.

On the other hand, the evidence does not preponderate against the trial court's finding that fog was present and heavy enough to impair driving conditions to the point that the Decedent was obligated to use extreme caution. Common sense suggests that it is unlikely that an overturned vehicle at this location would have gone unreported from 2:00 to 3:33. Common sense and experience also suggests that the fog gradually thickened from 2:00 to the time of the accident. Following the 911 call, Cooper drove slow all the way from his home to the accident because of the fog. It was so thick when Cooper and first responders arrived, that it impaired even the ability to investigate the accident. The only thing that cuts against a finding of heavy fog is that the headlights were burning on high beam, but there are a myriad of reasons, including a violent collision of the vehicle with barriers and road surfaces and movement of the Decedent within the cab, that would explain the lights being on high beam. The evidence does not preponderate against the trial court's finding that sufficient fog was present to play a major role in the accident and that the Decedent should have been exercising extreme caution but was not.

Another factor that could have played into the equation used by each fact finder is the fact that the "critical speed" was in the range of 100 mph. The jury could have concluded that there was no great harm in speeding a little in the early morning hours on a road that would accommodate such a high speed. The trial court indicated that the road allowed plenty of safety factors for the Decedent to have brought his vehicle to a stop if he had simply exercised reasonable care for his own safety.

There is nothing before us to suggest that the jury was not properly instructed as to the factors it should consider when apportioning fault.[5] We presume that they followed the instructions given. *Johnson v. Tennessee Farmers Mut. Ins. Co*, 205 S.W.3d 365, 374 (Tenn. 2006). The trial court did not conduct a lengthy analysis, but clearly did consider the factors set out in *Eaton v. McLain*, 891 S.W.2d 587 (Tenn. 1994). The *Eaton* factors are as follows:

> In summary, the percentage of fault assigned to each party
> should be dependent upon all the circumstances of the case,

---

[5]The jury instructions are not included in the record. No issues are raised on appeal regarding them.

including such factors as: (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Id.* at 592 (footnotes omitted).

The plaintiff directs considerable criticism at the trial court's analysis as a fact finder to its mention of fog and forseeability and its purported minimization of the risk to motorists associated with the exposed rail. It should be clear from our discussion above that we do not agree that the trial court handled the fog aspect incorrectly. The "reasonableness" query posed by the second *Eaton* factor invites consideration of how likely, or "foreseeable," it was that the risk would materialize into injury. Common logic teaches it is more reasonable to allow a risk that would seldom result in injury, than one that would often result in injury. We do not believe that the trial court minimized the risk. The court assumed the State was negligent when it made its comparative fault analysis. It is true that in its earlier discussion, the trial court found that the State acted reasonably, but it reached that conclusion, not by minimizing the risk of the exposed rail, but by considering other risks that it believed would have been generated had the State opted to install the transition panel on an otherwise makeshift crash cushion. Because we are convinced the trial court's belief that expert testimony was necessary to establish the standard of care impacted its conclusion that the State was without negligence, we do not concur in its finding that the State was not negligent. Nevertheless, we do not believe that finding corrupted the apportionment of fault, especially since the court explicitly stated that it was assuming the State to be at fault for the purpose of determining the Decedent's comparative fault. Lest it go unmentioned, we note that one factor that weighs heavily in favor of apportioning at least half the fault to the Decedent is that he had, as the trial court found, the last clear chance to avoid all of this had he simply obeyed the traffic signs and slowed his vehicle down to a reasonable speed once he saw he was in a construction zone.

To summarize, we hold that the trial court erred in setting aside the jury verdict as to Blalock on the ground that no reasonable juror could find that the Decedent was less than 50% at fault, referenced above as the third finding. As we have indicated, there are

numerous fact issues that the jury could resolve in the plaintiff's favor so as to apportion to the Decedent a lesser degree of fault. We also hold that the evidence does not preponderate against the trial court's finding that the Decedent was at least 50% at fault, referenced above as the second finding. In reviewing the jury's factual findings, as regards the first finding, it does not matter what we would find. In reviewing the trial court's factual findings, we must review all the evidence to determine exactly what we would find. We presume the trial court's findings to be correct, but only if the evidence does not preponderate against them. Tenn. R. App. P. 13(d).

Having concluded that the trial court erred in directing a verdict in favor of Blalock, we turn now to the question of what to do concerning the trial court's order conditionally granting a new trial. The plaintiff asks us to reverse everything and reinstate the verdict. The plaintiff concedes that normally, absent "exceptional circumstances" we do not review the trial court's decision to grant a new trial as 13th juror. *See* **Holmes**, 551 S.W.2d at 687. The plaintiff argues that exceptional circumstances are presented in this case because of the legal errors made by the trial judge. If it were true that exceptional circumstances exist anytime a trial court sets aside a jury verdict based on an error of law, then the "general rule" of remanding for a new trial identified in **Holmes** would not stand for much. The only case the plaintiff has presented where an appellate court has reinstated the verdict rather than remanding for a new trial is **Huskey v. Crisp**, 865 S.W.2d 451 (Tenn. 1993). In **Huskey**, the trial court set aside the verdict, but *denied* the alternative motion for a new trial. This Court reversed and ordered a new trial. The High Court agreed that the verdict should not have been set aside as a matter of law but disagreed with this Court that the case needed to be retried. **Id**. at 455. Instead, it ordered that the verdict be reinstated. **Id**. Although the High Court stated in **Huskey** that **Holmes** was not controlling, we think what the Court meant was that the "general rule" did not control in **Huskey**, but that the exception did. **Huskey** conformed exactly to the example of exceptional circumstances given in **Holmes**, *i.e.*, "the trial court erred in ruling on a controlling conclusion of law and has approved the verdict of the jury." 551 S.W.2d at 687. In **Huskey**, it was important that the trial court "expressly denied . . . [the] motion for a new trial." 865 S.W.2d at 455. That did not happen in the present case. The trial court explicitly stated that it could not approve the verdict.

We also note that remanding the case for a new trial in light of the trial court's dissatisfaction with the jury's apportionment of fault is consistent with and in fact required by **Jones v. Idles**, 114 S.W.3d 911, 914-15 (Tenn. 2003)("Accordingly, we reiterate our conclusion expressed in earlier cases that where a trial court acting as the thirteenth juror finds that the jury's allocation of fault is unsupported by the weight of the evidence, the only remedy is the granting of a new trial."). The plaintiff's suit against Blalock is remanded to the trial court for a new trial.

V.

That part of the judgment that dismisses the claim against the State is affirmed.  That part of the order granting judgment to Blalock notwithstanding the jury's verdict is vacated.  Costs on appeal are taxed to defendant Blalock.  This case is remanded for a new trial as to Blalock.

_____
CHARLES D. SUSANO, JR., JUDGE