# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 17, 2012 Session

## WADE ROBINSON, ET AL. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Knox County**
**No. 2-79-07     Wheeler A. Rosenbalm, Judge**

---

**No. E2011-01540-COA-R3-CV-FILED-JULY 31, 2012**

---

Wade Robinson and Melanie Robinson ("Plaintiffs") sued the State of Tennessee ("State") regarding a motor vehicle accident that resulted in the death of Plaintiffs' son, Zachary L. Robinson. After a bench trial, the Trial Court entered its judgment finding and holding, *inter alia*, that the State had not violated Tenn. Code Ann. § 9-8-307(a)(1)(I) or § 9-8-307(a)(1)(J), and that the actions of Zachary L. Robinson were the sole proximate cause of the accident. We find and hold that the evidence preponderates against the Trial Court's findings that the State did not violate Tenn. Code Ann. § 9-8-307(a)(1)(I), that the State did not violate Tenn. Code Ann. § 9-8-307(a)(1)(J), and that Zachary L. Robinson was the sole proximate cause of the accident. We find and hold that Zachary L. Robinson was 50% at fault for the accident and that the State was 50% at fault for the accident.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed, in part; Affirmed as Modified, in part; Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Donna Keene Holt, Knoxville, Tennessee, and Paul Kaufman, Atlanta, Georgia, for the appellants, Wade Robinson and Melanie Robinson.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Dawn Jordan, Senior Counsel, for the appellee, State of Tennessee.

# OPINION

## Background

This lawsuit arises from a motor vehicle accident ("the Accident") which resulted in the tragic and untimely deaths of eighteen year old Zachary L. Robinson and sixteen year old Lynsey M. Ford. Ms. Ford was a passenger in a vehicle driven by Mr. Robinson on March 3, 2006. At approximately 11:45 p.m., Mr. Robinson was driving on Lovell Road in Knoxville, Tennessee and was in the process of attempting to merge on to Pellissippi Parkway when he lost control of his vehicle and collided with a tractor trailer truck. Mr. Robinson and Ms. Ford both died.

Plaintiffs filed suit in the Circuit Court for Knox County individually and as next of kin of Zachary L. Robinson against Averitt Express, Inc. and Michael L. Knauff. Plaintiffs also filed suit in the Claims Commission against the State. In separate actions, Rebecca W. Ford sued Averitt Express, Inc. and Michael L. Knauff in the Circuit Court of Knox County and also filed suit in the Claims Commission against the State both individually and as next of kin of Lynsey M. Ford. Plaintiffs' claims in the Claims Commission were transferred to Circuit Court and consolidated with their pending Circuit Court case. Plaintiffs' claims also were consolidated with Ms. Ford's claims[1] for purposes of trial[2]. Plaintiffs' suit and Ms. Ford's suit were separated again for purposes of appeal. We resolve Ms. Ford's appeal in our Opinion in *Ford v. State*, docket No. E2011-01072-COA-R3-CV, released contemporaneously with this Opinion.

At trial, Eric Dewayne Hamby, who witnessed the Accident, testified. Mr. Hamby stated: "It was after 11:00 p.m. I got called in to work [at the Oak Ridge TVA facility] to rescue somebody off an elevator, 11:30ish, 11:45ish, something like that." The weather was clear and the roads were dry. Mr. Hamby testified that the only traffic on Pellissippi Parkway was his vehicle and "a transfer truck that I was coming up on. He was in front of me." Mr. Hamby explained:

> I was approximately 75 to 100 feet behind the tractor trailer, coming up on him. I was traveling maybe 60 miles an hour, and he was traveling slower than I was, because I was fixing to pass him pretty soon because I had been coming

---

[1] Ms. Ford's claims in the Claims Commission had similarly been transferred to Circuit Court and consolidated with her Circuit Court case.

[2] Prior to trial, Plaintiffs' and Ms. Ford's claims against Averitt Express, Inc. and Michael L. Knauff were voluntarily non-suited.

up on him for the past mile or so…. We come up on the Lovell Road exit and actually passed where you get off of Lovell Road and was coming up on where Lovell Road comes into Pellissippi and you can get back on from Lovell Road to Pellissippi. The transfer truck was in the right lane. I was in the right lane behind him. Just off to [the] right, I could see a small car coming around the curve almost straight into the side of the transfer truck at about where the jacks or the rear wheels are of the transfer truck, maybe just a little further back. The car was almost perpendicular to the transfer truck…. [H]e had actually passed - - you have a curve and it comes into a drive-out lane to where you merge, a merge lane, I guess, where you would merge into Pellissippi, I guess you would call it. He was at the curve. The transfer truck had already passed the mouth of the curve, and the car was coming across the curve and never really actually got to the drive-out into the Pellissippi lane. He just drove straight across.

When asked to estimate the speed of the car, Mr. Hamby stated:

He was going at least 50, probably closer to 55 or 60, when he came around the curve, just a guess, just from what I observed. I'm no expert…. He could have been going 70 or 75. I don't know. He was definitely going - - the wheels were cut to the right and he was sliding, skidding toward the transfer truck…. I could see the car coming across through there. It looked to me like he was going at a high rate of speed for that curve. In my mind, I thought he's not going to make that curve. He's going to hit the truck.

Mr. Hamby did not see the brake lights on either the car or the truck.

James Alan Parham testified as an expert witness for Plaintiffs. Mr. Parham is a licensed professional engineer who works for Parham Engineering Consultants, which he described as "a civil and forensic engineering consulting practice specializing in accident reconstruction" Mr. Parham is a registered professional engineer in Tennessee and five other states.

Mr. Parham reconstructed the Accident. When asked what methodology he uses in his reconstructions, Mr. Parham stated: "I will evaluate three different components of the accident generally, to start with, and focus on each of those. One is the driver behavior. The second is mechanical or the vehicle characteristics. And the third would be the roadway itself." He further explained:

In - - in the methodology I was looking at the path the vehicles, both vehicles,

were traveling prior to the point of impact. The - - the car was traveling along a curved path, came up to a sharper turn in the roadway at the end of this on-ramp or during the process of this on-ramp, whereas the tractor-trailer was traveling down-grade along a straight section of roadway. And that would be where I would look at the driver behavior aspects.… The next step would be to look at the vehicle characteristics, the size difference between the two in this particular case, and any kind of characteristics that may have been - - was there a mechanical malfunction.… The next step was to look at the roadway itself in which the vehicles were being operated. And in this process was to evaluate the geometrics of the roadway, the weather conditions that were in play at the time, and things environmentally related to this location.

Mr. Parham formed an opinion regarding how fast Mr. Robinson's vehicle was traveling and testified: "The - - the speed that I have been able to derive would be based upon the skid marks that are left here approaching the area of impact.… The minimum speed would be approximately 30 miles per hour." Mr. Parham opined: "The primary cause of this accident was the inconsistency or the inappropriateness of this ramp and the lack of warning leading up to this ramp advising the driver of the impending situation." Mr. Parham testified that a safe speed on the ramp would be 30 or 35 miles per hour. He admitted that it was possible that someone could drive on the ramp at 40 miles per hour.

Mr. Parham testified that the 1965 American Association of State Highway Officials ("AASHO")[3] blue book was in effect and in place as the design manual for the State when Pellissippi Parkway was designed in 1968. He stated: "Typical DOTs, cities, counties will adopt this [the AASHO blue book] in and use these principles directly out of the manual or they will modify them as they might see need to in different parts." Mr. Parham stated: "In the original design [of Pellissippi Parkway], the - - the bridge - - the ramp itself came up to a stop sign condition where it connects to Pellissippi Parkway, and there was no acceleration lane in the original design to - - that would cross the bridge or that would approach the bridge."

At some time later, changes were made to the ramp. Mr. Parham contrasted the site before and after the changes explaining:

Along the - - the exterior portion, there appear to be delineators that were called for here, and there were no delineators in this area at this time. And this was operated as a stop sign, whereas here is a yield sign. There were no

_____

[3] Mr. Parham explained that in the 1970s the AASHO brought in transportation officials and changed its name to AASHTO. (59-60)

chevrons in this one. There are two chevrons here. In the original there was no acceleration lane, whereas there is a small acceleration lane provided here.

Mr. Parham had performed a field examination of the Accident site around May of 2005, prior to the Accident. He stated that, sometime after his May 2005 field examination of this site, two chevrons were placed in the island alongside the lane approaching Pellissippi Parkway. Mr. Parham stated that the only difference at the site between May of 2005, when he did his field examination related to a different incident, and March of 2006, when the Accident happened, is the chevrons.

Mr. Parham opined that the compound curve transition of the ramp from Lovell Road on to Pellissippi Parkway does not meet the AASHO guidelines. He stated it goes from a long-radius to a very short-radius curve and this makes it a compound curve. He testified that the 1965 AASHO book provided:

Compound curves with large differences in curvature introduce problems similar to those that arise at a tangent approach to a circular curve. In compounding, the radius of the flatter circular arc should not be more than 50 percent greater than the radius of the sharper circular arc. Where this is not feasible, an intermediate curve or spiral should be used to provide the necessary transition.

Mr. Parham testified about driver expectation and the compound curve stating:

There was no warning otherwise provided anywhere back through here that this was not a high-speed on-ramp. There is a grade separation, there is the curved path, and this would be very consistent with a high-speed on-ramp versus what's right across the facility here, where it is not a high-speed; it's just a direct intersection type design where the driver's approaching it like they would a typical intersection. But one here has the appearance of being a high-speed on-ramp.

When asked what could be done to address driver expectancy in a situation such as this, Mr. Parham stated:

There are two things that can be done primarily. One is that the radius be compatible, this - - on the entrance terminal would be compatible with the ramp section proper, and this would be that this radius would be no less than one-half of the ramp proper terminal - - or, excuse me, the ramp proper radius. This could be no more difference than one-half. (Indicating)

If there is a situation that's constructed like this, then there is a mechanism where you could come in and warn the drivers, give advance notice as they're coming up here, of this situation.

When asked if there were driver warning signs, Mr. Parham stated: "No. There were no signs approaching this - - this area here advising the drivers in advance of this condition or of a need for speed reduction or anything like that at the time of this accident."

Mr. Parham was asked about safe vehicle speed, and he stated:

Coming through the ramp proper, this is designed to be able to accommodate traffic that's driving approximately 35 to 40 miles per hour. As the vehicle would approach this tighter-radius area, the vehicles - - the speed would be on the line of 14 miles per hour. So we have a speed diff - - difference of 35 to 14. This is at least a 20-mile-an-hour differential…. And this would be a - - this would violate the drivers' expectancy. They would not expect something like this without warning of the impending situation.

The posted speed limit on Pellissippi Parkway at the time of the Accident was 55 miles per hour. Mr. Parham stated:

This - - this has two - - two negatives, or two issues, I should say. One is the large speed differential between the large radius and the small radius is a - - is a driver expectancy violation. The driver is not warned of this situation; therefore, they don't have time to react to this, and it can cause issues right here with the vehicle not being able to travel on this. (Indicating)

The second issue is with this low radius - - small radius and low design speed, the speed differential between the entering traffic stream and the through traffic stream is very great, and that itself can form a hazardous condition on the main lines of the roadway.

Mr. Parham opined that the warnings on the actual ramp portion are not sufficient to address the dangers created by the compound curve configuration. He stated:

The chevrons that were placed in the island here are alongside the roadway. They - - in order to be effective, they would need to have extended beyond, as required by the MUTCD, the Manual on Uniform Traffic Control Devices, through the extent of the situation, and they did not. (Indicating) Also, these

-6-

chevrons simply do tell the directional change of a curve. They do not tell the amount of speed that would need to be reduced or what a safe operating speed is at this location.

Furthermore, there was no advance warning, such as a yield ahead or a turn ahead sign with a supplemental speed plate or anything else to advance warning directly, clearly, as the manual states it should, prior to this location in time that the driver, the approaching driver, could make the appropriate actions and reduce their speed.

Mr. Parham explained that the Manual on Uniform Traffic Control Devices ("MUTCD") was developed by the Federal Highway Administration starting in the 1930s. The MUTCD is designed to provide consistent and uniform signs, markings, traffic signals, etc. as indicators for drivers to make them uniform across the country. Mr. Parham testified that Tennessee adopted the MUTCD as is from the Federal Highway Administration.

Mr. Parham opined that the site of the Accident was not in compliance with the MUTCD on the date of the Accident. He stated:

Two of the larger - - three of the larger areas of concern where it is out of compliance are as follows: One is there is a sharp turn ahead. There is no advance notice of this, telling the driver of this impending condition as they approach and warning the drivers of what speed would be advisable to drive the roadway at that location.

The second one is there is no advance notice of this yield sign provided. Granted, the yield sign can physically be seen from a further distance back. It is outside of the driver's field of view until they're very close to it. There's no advance - - because of the curve of the road, there is no advance warning given here.

* * *

The third issue is positive guidance, which is addressed in the MUTCD. There is no guidance delineating this curved area here, this sharp area, to the driver as they would approach this.

Mr. Parham testified about the traffic signs existing at the site as of the date of the Accident stating that it is 50 feet from the yield sign to Pellissippi, which he admitted is pretty much the limit of how far from the through road such a sign should be set according

to the MUTCD. He stated that the yield sign did not provide advance warning of the dangerous condition because: "It is located near the dangerous condition, not in advance of it." He also testified that the chevrons which were in place did not provide advance warning because they are at and not before the dangerous situation. Mr. Parham testified that he would qualify this as a hazardous area.

Mr. Parham admitted that the yield sign can be seen from approximately 400 feet away. When asked if the yield sign would be visible to the same extent at night, Mr. Parham stated:

Not under typical motor operations, not at nighttime, it would not be.… Because the vehicle headlights would be facing away from it or would not be aimed at it as the vehicle is coming around the curve. They would be shining on the outside of the curve, and so the vehicle would have to be in relatively close proximity to the yield sign for the driver - - for it to illuminate.

These signs are designed to reflect light back toward the vehicle, toward the source, and so if the light is not getting onto it, it will not reflect back. Also, the angle at which the sign is placed is - - is going to be turned so that you've got to be up fairly close to get the light from the headlights to reflect back to it as well.

When asked if there was ample sight distance down Pellissippi from the ramp, Mr. Parham stated: "Yes. If it were set up as an intersection, there would be ample sight distance."

Mr. Parham determined that a driver of an automobile would be able to see the yield sign at night at approximately 100 feet. He testified that a car traveling 40 miles per hour would travel approximately 160 feet in two and a half seconds. When asked what the purpose of a yield sign is, Mr. Parham stated:

The purpose of the yield sign is to establish who has the yield or to give the right of way to oncoming traffic. It does not require a full stop unless there - - it's not mandatory to have a full stop. It's basically so you can slow down but still progress at a low speed through a - - into the intersection or the merge activity. I think that yield signs are very appropriately used in a lot of places.

Mr. Parham agreed that one objective of a yield sign is to allow for ramp traffic to safely transition into the primary traffic. He stated that he believes that this yield sign accomplishes this objective. He opined, however, that the features of positive guidance on the ramp including the yield sign were inadequate.

-8-

Mr. Parham admitted when asked that the MUTCD states that engineering judgment is required for placing signs. He testified that the MUTCD states:

> The decision to use a particular device at a particular location should be made on the basis of either an engineering study or the application of engineering judgment. Thus, while this manual provides standards, guidance, and options for design and application of traffic control devices, this manual should not be considered a substitute for engineering judgment.

He further testified that the MUTCD defines engineering judgment stating: "Engineering judgment shall be exercised by an engineer … for the purposes of deciding upon the applicability, design, operation, or installation of a traffic control device."

Mr. Parham opined that: "The primary cause of this accident was the inconsistency or the inappropriateness of this ramp and the lack of warning leading up to this ramp advising the driver of the impending situation." He further opined: "If these [warnings such as a speed advisory sign and additional chevrons] had been in place at the time, more probably than not, this accident would not have occurred."

Amanda Snowden, the Assistant Regional Director for the Tennessee Department of Transportation, Region 1, testified as the State's representative. Ms. Snowden is a licensed professional engineer. At trial, Ms. Snowden was qualified as an expert on traffic engineering.

Ms. Snowden testified that one of her jobs is to decide what kind of signs to place to improve the safety of intersections and interchanges. In 2005, she was the assistant regional traffic accident engineer and her job involved sign changes. Ms. Snowden stated that she would look at locations and make recommendations about sign changes and then "it would be up to the traffic engineer to decide what to install."

Ms. Snowden testified that the interchange at issue had a stop sign when it was designed. At some time the stop sign was changed to a yield sign, but the State has no data as to when this change was made. The acceleration lane was added to the ramp when this sign change was made. Ms. Snowden agreed that all highways in Tennessee are required to conform to AASHTO and TDOT safety standards. She stated: "The actual length of the acceleration lane did not comply with AASHTO standards. However, it complied because of the presence of the yield sign."

Ms. Snowden testified that a safe speed on the gentle portion of the ramp curve would be 35 to 40 miles per hour. She admitted that it could potentially be driven safely at

45 miles per hour. She stated that a safe speed on the sharp final portion of the curve would be somewhere between 10 and 15 miles per hour. Ms. Snowden agreed that a car traveling at a safe speed would have to drop its speed by around 30 or 35 miles per hour to negotiate the final sharp curve.

Ms. Snowden admitted that as of May of 2005 the chevrons were not at the site, but that as of March 3, 2006, the date of the Accident, the chevrons were there. Ms. Snowden was asked what signs were present at time of Accident, and she stated:

> Based on what we've reviewed, we can tell that there were route markers as you turn onto the ramp. There would be signing that would be placed probably on Lovell Road to tell motorists their direction onto 162. Once you approach the gore area of the ramp, I believe we have the presence of two chevrons and a yield sign with a one way sign above it.

There were no speed limit signs on the ramp.

Several critical admissions were made by Ms. Snowden at trial, and we quote several sections of questions and answers from her trial testimony as follows:

Q. Would the State generally have an advisory speed in conjunction with chevrons if cars going the standard speed of the roadway would not be able to negotiate the curve?

A. Yes.

Q. If the speed limit on a roadway is 55 and you can't negotiate that curve at 45, then speed limits below that ten mile per hour reduction would have to be signed with an advisory speed. Do you agree with that?

A. Yes.

Q. That's for the safety of the drivers?

A. Yes.

Q. Now, we have already established that if a car is safely going 45, there's at least a 30 mile an hour reduction required to get through this last curve?

A.    Yes.

Q.    Wouldn't you agree that this curve, in 2005, should have had the advisory speed ahead, along with the chevrons, since there was such a big drop in speed required?

A.    There's no doubt that you can always add additional signing. That's the whole premise of the manual and traffic control devices in general. The addition of a speed advisory certainly would have been something that would have been a supplement to the area.

Q.    Is that a yes?  My question was, since you agreed that with a reduction of 15, the chevrons must be accompanied by a speed advisory reduction sign, wouldn't you agree that, in this situation in 2005, that the State was required to have a speed reduction sign with these chevrons?

A.    With it being our rule of thumb at the time and a guideline, it does seem that it probably would have been - - should have been in place.

*  *  *

Q.    You have told us that a safe speed in the soft portion of the curve was 35 to 45?

A.    Yes.

Q.    And you have told us that a safe speed in the sharp curve was 10 to 15?

A.    Yes.

Q.    That is a reduction of more than ten miles per hour to safely make that curve, isn't it?

A.    Yes.

Q.    That would place an advisory speed sign requirement, according to the Tennessee Department of Transportation rule, in advance of that curve, wouldn't it?

A.    Yes.

-11-

Q. There was none, was there, on March 3rd, 2006?

A. No.

Q. You don't know why there wasn't one there, do you?

A. I do not, no.

* * *

Q. Wouldn't you agree that, with the information available in mid 2005, that the exercise of risk of engineering judgment doing a risk/benefit analysis would show that the benefit of placing the ten mile an hour ramp speed, advisory speed sign, the benefit would overwhelmingly outweigh the risk?

A. Well, as we have stated, adding traffic control devices, no matter what they are, is going to be a benefit to the motorist. So the answer, I guess, would be yes to your question. It would certainly be a benefit to a location.

* * *

Q. Just in applying engineering judgment without a study, wouldn't you agree that there's a risk to the motorist of omitting the ten mile an hour ahead sign, the risk being that he won't know that he needs to slow down by that much to safely negotiate the sharp curve ahead?

A. Yes, as far as knowing the speed he needs to slow down to, yes.

Q. Would you agree that there's a benefit to the motorist to have the slow 90 degree curve sign ahead painted on the road?

A. Yes. It's a benefit, yes.

Q. And that's there's a risk to the motorist of omitting that?

A. Yes.

Q.   You would agree that there's a benefit to the motorist of having the extra chevrons and the chevrons with an arrow added?

A.   Yes.

Q.   There's a risk to the motorist of omitting those?

A.   Yes.

Q.   I believe you said that the State must do all it reasonably can to warn motorists of specific hazards ahead that it is aware of?

A.   Yes.

Q.   In fact, would you agree that once the State is made aware of a situation, really no matter what it is, that it's the State's responsibility to ensure that we do our best to make it as safe as possible?

A.   Yes.

Q.   Wouldn't you agree that, in mid 2005, the State reasonably could have placed the ten mile an hour ahead sign?

A.   Yes, we could have.

Q.   And the State reasonably could have placed rumble strips?

A.   Yes.

Q.   And the State reasonably could have placed the slow 90 degree curve sign?

A.   Yes.

Q    The State reasonably could have placed extra chevrons?

A.   Yes.

Q.   The State reasonably could have put reflective poles on bigger chevrons?

-13-

A. Reflective strips on the posts, yes.

Ms. Snowden also stated:

Well, a yield sign in and of itself is a traffic control devoice [sic]. So a driver needs to take warning to every traffic control device. Is it adequate? Probably not. There's other ways to warn the driver, but it is there, so it is something that the driver needs to be aware of.

Ms. Snowden testified: "In the MUTCD, there is sign legibility values, as well as advanced placement for signs. So that's used whenever we place our signs in the field." She stated: "we try to make sure signs are visible during daytime and nighttime conditions, which would mean if headlights hit a sign, they are going to reflect. They are reflective. So if your headlights hit a sign, they are going to reflect back to the driver's eye."

Ms. Snowden agreed that warning signs are relatively inexpensive to an overall highway construction project. Ms. Snowden was asked where funds come from for new highway signs and she stated: "TDOT obviously has a maintenance budget every year, an annual budget. As we put signs up, they are charged to the county in which they are installed, and that comes out of our total maintenance budget." She further stated the money would be from State funds, unless they were working on a federal aid project, but added that in 2005 and 2006 there were no federal construction projects at the interchange at issue in this suit.

Ms. Snowden was asked about a file maintained by the State with regard to the intersection at issue, which contained two earlier accident reports. Ms. Snowden was asked what the purpose was for this file, and she stated:

Typically, whenever we get a concern or a complaint come in, we will make - - if it's an intersection, we make it an intersection file. They are signified with colored dots, was the way we did it. The intersection file had a green dot on it. So once we actually had knowledge of a location, we would make a file on it, if it was an intersection type location.

She further admitted that although there is no record of when or why the chevrons were placed, the State would have received some type of complaint or notification about a potentially dangerous condition on the interchange, or the chevrons would not have been placed.

After trial, the Trial Court entered its judgment on April 15, 2011 incorporating

-14-

by reference its Memorandum Opinion in which it found and held, *inter alia*:

Lynsey Ford and Zachary Robinson's unfortunate and untimely deaths occurred on March 3, 2006 at approximately 11:45 p.m. as a result of a motor vehicle accident. That accident occurred at the intersection of Lovell Road and Pellissippi Parkway here in Knox County. Pellissippi Parkway is a state highway, as I recall, and the record shows it is identified as State Highway 162. At the time of the accident, Zachary Robinson was driving a Honda vehicle that was occupied by Lynsey Ford as a guest passenger. And the plaintiffs were attempting to enter the eastbound lanes of Pellissippi Parkway by way of a ramp that joined the eastbound lanes of Pellissippi Parkway with Lovell Road.

There is no serious dispute about how the accident in this case occurred. It was witnessed by Mr. Eric Hamby. And the Court does find that Mr. Hamby was a most credible witness. His testimony indicated that he was giving careful attention to his surroundings, and that he is a reliable witness to the things that occurred during the course of this accident or during part of the accident. And so there is no serious dispute in the mind of the Court about how the accident occurred.

The eye witness, Mr. Hamby, was traveling eastbound in the right-hand lanes of Pellissippi Parkway. He was going about 60 miles an hour, and was following an Averitt Express tractor trailer. Mr. Hamby was approximately 75 to 100 feet behind that tractor trailer, which he says was going about 55 miles an hour. And so Mr. Hamby was slowly gaining or catching up, gaining on or catching up with the tractor trailer. There were no other vehicles at that place on Pellissippi Parkway at that time.

When Mr. Hamby reached a point near where the Lovell Road ramp intersects with Pellissippi Parkway, he saw the Honda car driven by Mr. Robinson come around the curving ramp, which was over to Mr. Hamby's right, at a high rate of speed. The car left the ramp lane and traveled straight across the gore area that separates Pellissippi Parkway from the Lovell Road ramp. And Mr. Robinson's car ran straight into the right side of the tractor trailer driven or operated by Averitt Express. The car collided with the right side of that tractor trailer at a point near the front of the rear wheels on the tractor trailer. And the physical evidence that other proof shows is that the tractor trailer's right rear wheels ran up on the Robinson car and came to rest on top of the vehicle.

Mr. Hamby testified that he had observed the Robinson car for three or four seconds before its impact with the tractor trailer. He estimated that the Honda car was going at least 55 to 60 miles an hour as it left the ramp and crossed the gore area of the intersection. [Mr. Hamby] admitted that he -- that the vehicle could have been going as fast as 70 to 75 miles an hour. I agree with Mr. Farmer that in the course of delivering his testimony Mr. Hamby used the term guess. But in reviewing again his testimony in its totality, the Court has to conclude that he was paying careful attention. He was making a studied effort here in this courtroom to give an accurate account of what he saw and heard. And taking into account that lay people talk that way when they're asked to give estimates, the Court does not believe that [Mr. Hamby's] estimate of the speed of the Robinson Honda should be impugned or discredited in any way.

The Robinson car left approximately 50 feet of skid marks that ran straight into the side of the tractor trailer truck. There were some additional marks made by the collision of the vehicle, which, as I recall, some of the witnesses estimated to be approximately ten feet in length. And some of the witnesses actually characterized the skid marks as being 60 feet in total length. But in any event, the skid marks and the proof, physical proof recorded by photographic evidence that shows the nature of the collision, strongly suggest that Mr. Robinson's car was traveling at a high rate of speed, as related by Mr. Hamby.

The ramp on which Mr. -- Pardon me. The ramp on which the plaintiffs were traveling just prior to this accident joined Lovell Road with the eastbound lanes of Pellissippi Parkway. That ramp is approximately two tenths of a mile long. At its beginning, where it joins Lovell Road for vehicles traveling the way the Robinson car was traveling, the ramp makes a long gentle curve to the right. This part of the curve has a 230 degree radius. As that ramp nears Pellissippi Parkway, it makes a sharper turn to the right that so it's an able joinder of the ramp with the acceleration lane for eastbound traffic on Pellissippi Parkway. This part of the ramp's curvature, according to the expert testimony, has a 65 degree radius. This kind of ramp is commonly referred to by engineers and designers as a compound curve.

The Lovell Road ramp accommodates two-way traffic. Thus cars may exit or leave Lovell Road and enter Pellissippi Parkway eastbound. Or cars which are eastbound on Pellissippi Parkway, as they approach this ramp going east, may exit Pellissippi Parkway to get onto Lovell Road. And so a good part

of the ramp is a ramp or a roadway providing for two-way traffic. A double yellow line separates the two-way traffic on that portion of the ramp that accommodates two-way traffic. And white reflective paint delineates the sides of the rampway from beginning to end.

At the point where the ramp begins to make a sharper turn to the right, two chevrons are located on the left side of the rampway to indicate a coming change in direction. At this point, the ramp for two-way traffic entering Pellissippi Parkway to go east becomes a one-way lane for vehicles entering Pellissippi Parkway. And the area immediately preceding the beginning of the acceleration lane is marked with white reflective paint along the sides of the rampway, and also delineated or outlined by embedded reflectors along both sides of the ramp. A reflective yield sign and a one-way marker atop the post bearing that yield sign is posted on the right side of the ramp, and that one-way sign and yield marker is approximately 50 feet from Pellissippi Parkway, according to the estimates of the experts. These signs, as well as the two chevrons on the left side of the ramp, are visible, during daylight hours at least, to approaching drivers from 400 feet away.

Although there is no dispute about how the accident occurred, there is considerable dispute about why it occurred. I agree with Mr. Farmer, the key question in this case is: What caused this accident? The plaintiff contends - - The plaintiffs contend that the accident occurred and that the state is at fault in this case because the roadway was negligently designed, constructed and maintained, and that the intersection constituted a dangerous condition, all within the meaning of Tennessee Code Annotated Section 9-8-307(a)(1)(I)(J). Stated another way, the plaintiff's theory is that the curvature and configuration of the ramp and the lack of certain signage on that ramp was such that Zachary Robinson was caused to believe that he could travel on the ramp and into the intersection of Pellissippi Parkway at a speed that was unsafe.

More specifically, plaintiffs argue that the configuration of the ramp violated what plaintiffs' expert characterized as certain standards published by the American Association of State Highway Officials, commonly referred to in this case as AASHO, all capital letters. And plaintiffs argue that the lack of certain kinds of signage on the ramp violates the Manual of [sic] Uniform Traffic Control Devices, frequently referred to in this record as MUTCD.

After very careful consideration, the Court is constrained to conclude

-17-

that the plaintiffs have not established that the configuration of the Lovell Road ramp violates the policies of the American Association of State Highway Officials.

* * *

After careful consideration, the Court must also conclude that the state has not violated any provision of the Manual of [sic] Uniform Traffic Control Devices. The testimony in this case shows that the signs and highway markings that were located on the Lovell Road ramp on March 3, 2006 comply with the requirements of the MUTCD. The plaintiffs' expert argues, however, that additional signage and rumble strips should be placed on the ramp.

* * *

The Manual of [sic] Uniform Traffic Control Devices, however, does not require the installation of the signs and markings recommended by plaintiffs' expert. The MUTCD says in Section 1A.09, and I quote: "This manual describes the application of traffic control devices, but shall not be a legal requirement for their installation." Further, in elaborating upon that statement, the manual, which is filed as Exhibit 20 in the record, says, and I quote: "The decision to use a particular device at a particular location should be made on the basis of either an engineering study or the application of engineering judgment. Thus while this manual provides standards, guidance and options for design and application of traffic control devices, this manual should not be considered a substitute for engineering judgment." The Court, therefore, respectfully concludes that the plaintiffs have not shown that the state has violated any part of the MUTCD.

* * *

The plaintiffs are not entitled to rely upon a presumption of due care in this case because there is an abundance of evidence that establishes that Mr. Robinson was not exercising due care. The proof shows that at the time of the accident Mr. Robinson was operating his car at an excessive and unreasonable rate of speed, that he was not keeping a proper lookout, that he did not have the car under reasonable and proper control, and that he did not yield the right of way to the traffic on Pellissippi Parkway. Further, Mr. Robinson violated the following rules of the road enacted by the legislature: TCA 55-8-109, obedience to traffic control devices; TCA 55-8-123, driving on roads laned for

-18-

traffic; and as previously cited, TCA 55-8-130(c)(1) yielding at an intersection. In the opinion of the Court, this evidence establishes that Mr. Robinson was negligent and that his negligence was the proximate cause of the accident in the plaintiffs' very unfortunate injury.

And so to conclude, the Court must respectfully submit that it does not believe that the plaintiffs have established by a preponderance of the evidence in this case that the State of Tennessee had a duty to make those changes on the ramp at Lovell Road as urged by plaintiffs' expert, and the Court does not believe the plaintiff has established by a preponderance of the evidence that the State of Tennessee was negligent or that any negligence on the part of the state was a proximate cause of the accident that's the subject matter of this litigation and plaintiffs' unfortunate death.

Plaintiffs appeal to this Court.

### Discussion

Although not stated exactly as such, Plaintiffs raise three issues on appeal: 1) whether the evidence preponderates against the Trial Court's finding that the proof failed to establish actionable conduct by the State under Tenn. Code Ann. § 9-8-307(a)(1)(I); 2) whether the evidence preponderates against the Trial Court's finding that the proof failed to establish actionable conduct by the State under Tenn. Code Ann. § 9-8-307(a)(1)(J); and, 3) whether the evidence preponderates against the Trial Court's finding that Zachary L. Robinson was the sole proximate cause of the accident.

Our standard of review for cases such as the one now before us was articulated in *Usher v. Charles Blalock & Sons, Inc.* wherein we stated:

When the trial judge acts as a trier of fact, as he does when acting as Claims Commissioner, our review of factual findings is *de novo*, upon the record with a presumption of correctness unless the evidence preponderates against the Commissioner's findings. Tenn. R. App. P. 13(d); *Cross v. City of Memphis,* 20 S.W.3d 642, 644-45 (Tenn. 2000). If the evidence preponderates against the trial court's findings, we are empowered to weigh the evidence and determine the appropriate outcome according to the preponderance of the evidence. This extends to allocating fault if necessary. *Keaton v. Hancock County Bd. of Educ.*, 119 S.W.3d 218, 225-26 (Tenn. Ct. App. 2003). Still, we review the trial court's legal conclusions *de novo*, with no presumption in

favor of the court's legal conclusions. *Campbell v. Florida Steel Corp.*, 919 SW. 2d 26, 35 (Tenn. 1996).

*Usher v. Charles Blalock & Sons, Inc.*, 339 S.W.3d 45, 58 (Tenn. Ct. App. 2010).

We first address whether the evidence preponderates against the Trial Court's finding that the proof failed to establish actionable conduct by the State under Tenn. Code Ann. § 9-8-307(a)(1)(I), which provides:

(a)(1) The commission or each commissioner sitting individually has exclusive jurisdiction to determine all monetary claims against the state based on the acts or omissions of "state employees," as defined in § 8-42-101(3), falling within one (1) or more of the following categories:

* * *

(I) Negligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways, or bridges and similar structures, and negligence in maintenance of highways, and bridges and similar structures, designed by the department of transportation as being on the state system of highways or the state system of interstate highways;

Tenn. Code Ann. § 9-8-307(a)(1)(I) (Supp. 2011).

As this Court stated in *Goodermote v. State*:

Under general principles of the law of negligence, the plaintiff must establish that the defendant owed a duty of care to the plaintiff, injury, and conduct of the defendant falling below the applicable standard of care which amounted to a breach of the duty, causation in fact, and proximate, or legal, cause. *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991).

* * *

The State has a duty to exercise reasonable care under all the attendant circumstances in planning, designing, constructing and maintaining the State system of highways. *See*, Tenn. Code Ann. Sec. 9-8-307(a)(1)(I). The State owes this duty to persons lawfully traveling upon the highways of Tennessee.

The State's conduct of failing to follow their own plans and industry safety standards constituted a breach of duty.

*Goodermote v. State*, 856 S.W.2d 715, 720 (Tenn. Ct. App. 1993). "The term reasonable care must be given meaning in relation to the circumstances. Reasonable care is to be determined by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury." *Usher*, 339 S.W.3d at 62 (quoting *West v. East Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005)).

We need not again restate in detail all the evidence presented at trial. Certainly the testimony of Mr. Hamby and Mr. Parham was both relevant and necessary to a resolution of the issues at trial and now before us on appeal. We, however, also find that Ms. Snowden's testimony is as equally relevant and critical to a resolution of these issues.

Ms. Snowden's testimony established that a driver driving at a safe rate of speed would need to reduce speed at least ten miles per hour in order to safely negotiate the compound curve on the ramp. In fact, Ms. Snowden testified that the safe speed in the soft portion of the curve was as much as 45 miles per hour and that the safe speed in the sharp portion of the curve was only 10 to 15 miles per hour. So according to Ms. Snowden, the reduction in safe speed from the soft portion of the curve to the sharp portion of the curve was as much as 30 to 35 miles per hour. Ms. Snowden's testimony also established that although it was a Tennessee Department of Transportation rule and guideline to install a speed advisory sign if a driver would need to reduce speed more than ten miles per hour in order to safely negotiate a curve, the Accident site had no such speed advisory sign.

The MUTCD states that engineering judgment should be used in making the decision to implement traffic signs. Ms. Snowden is a licensed professional engineer who was qualified at trial as a traffic engineering expert. Thus, Ms. Snowden's testimony about the necessity of installing a speed advisory sign is proof of her engineering judgment as the Assistant Regional Director for the Tennessee Department of Transportation, Region 1, and the State's representative at the trial. Furthermore, the record is devoid of evidence that the State exercised engineering judgment to make the decision to specifically not place a speed advisory sign on the ramp.

Ms. Snowden's testimony showed that the State's failure to follow its own rules and guidelines in this situation was a breach of the State's duty. The State had a duty to exercise reasonable care, and Ms. Snowden's testimony helped established that the State breached its duty when it changed the signage from a stop sign to a yield sign but failed to

install a speed advisory sign even though the safe rate of speed decreased suddenly on the compound curve on the ramp. Thus, the State negligently failed to maintain the ramp at issue leading from Lovell Road on to Pellissippi Parkway. Furthermore, Mr. Parham opined that the primary cause of the Accident was the inappropriateness of the ramp and the failure to warn drivers of the situation. He further opined that if the warnings had been in place, this Accident would, more probably than not, not have occurred.

Given the record before us on appeal, we find and hold that the evidence preponderates in favor of a finding that Plaintiffs established actionable conduct by the State under Tenn. Code Ann. § 9-8-307(a)(1)(I). We, therefore, reverse the Trial Court's holding with regard to this issue.

Next, we consider whether the evidence preponderates against the Trial Court's finding that the proof failed to establish actionable conduct by the State under Tenn. Code Ann. § 9-8-307(a)(1)(J), which provides the potential for liability based upon:

> (J) Dangerous conditions on state maintained highways. The claimant under this subdivision (a)(1)(J) must establish the foreseeability of the risk and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

Tenn. Code Ann. § 9-8-307(a)(1)(J).

As this Court explained in *Goodermote*:

Our Supreme Court discussed foreseeability in *McClenahan v.Cooley*, 806 S.W.2d 767 (Tenn. 1991), as follows:

> The foreseeability requirement is not so strict as to require the tortfeasor to forsee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. "The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen." It is sufficient that harm in the abstract could reasonably be foreseen.

*McClenahan*, 806 S.W.2d at 775 (citations omitted).

It was necessary only that the plaintiff establish that the State could

have foreseen the general manner in which the injury or loss occurred. *Id*.

*Goodermote*, 856 S.W.2d at 721-22.

The proof in the record on appeal shows that the State could have, and should have, foreseen that harm might occur in the absence of signage or traffic devices warning about the compound curve and the need to reduce speed to safely negotiate the curve. Additionally, along with the proof as discussed above, Mr. Parham opined that the interchange as designed and maintained constituted a dangerous condition. Mr. Parham testified that the design of the ramp violated the AASHO and driver expectations and, further, that the failure to warn drivers of the compound curve violated driver expectancy.

Ms. Snowden admitted, when asked, that the State had a file regarding this intersection that contained two earlier accident reports. She explained that such a file would be created after the State received a complaint or concern regarding an intersection. Thus, the fact that this file exists shows, by Ms. Snowden's own admission, that the State had received one or more complaints or concerns with regard to the intersection. She further admitted that although there is no record of when or why the chevrons were placed, the State would have received some type of complaint or notification about a potentially dangerous condition on the interchange, or the chevrons would not have been installed. Thus, Ms. Snowden's testimony establishes that the State had actual notice about a dangerous condition on the interchange at issue.

Given the record before us on appeal we find and hold that the evidence preponderates in favor of a finding that Plaintiffs established actionable conduct by the State under Tenn. Code Ann. 9-8-307(a)(1)(J). We, therefore, reverse the Trial Court's holding with regard to this issue.

Finally, we consider whether the evidence preponderates against the Trial Court's finding that Zachary L. Robinson was the sole proximate cause of the Accident. In light of our determination regarding Plaintiffs' first two issues, we find and hold that the evidence preponderates against a finding that Zachary L. Robinson was the sole proximate cause of the Accident. As already discussed in this Opinion, a preponderance of the evidence supports a finding that the actions of the State were a proximate cause of the Accident and that the State bears some portion of the fault for the Accident.

The preponderance of the evidence as already discussed, however, also supports a finding that while Zachary L. Robinson was not the sole proximate cause of the accident, he was at fault. Particularly relevant to the allocation of fault to Zachary L. Robinson is the testimony of Mr. Hamby. We note that the Trial Court specifically found

-23-

that Mr. Hamby "was a most credible witness," and we certainly see nothing in the record to call this credibility determination into question. Mr. Hamby estimated the speed of Zachary L. Robinson's car as being at least 55 to 60 miles per hour and possibly as fast as 70 or 75 miles per hour. Even in the absence of sufficient speed advisory or warning signs or indicators, the speed clearly was excessive for this roadway. Given all this, we find that the evidence preponderates in favor of a finding that the State was 50 % at fault for the Accident, and that Zachary L. Robinson was 50% at fault for the Accident.

## Conclusion

The judgment of the Trial Court is reversed, in part, and affirmed as modified, in part, so that 50% of fault for the Accident is assigned to the State, and 50% of fault for the Accident is assigned to Zachary L. Robinson. As we, however, have allocated 50% of fault for the Accident to Zachary L. Robinson and 50% to the State, the judgment of the Trial Court in favor of the State and dismissing the claims of Wade Robinson and Melanie Robinson, individually and as next of kin of Zachary L. Robinson, is affirmed. *See McIntyre*

*v. Balentine*, 833 S.W.2d 52 (Tenn. 1992). This cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, and their surety.

_____
D. MICHAEL SWINEY, JUDGE

-24-