# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 28, 2012 Session

## KAREN STONER, EXECUTRIX OF THE ESTATE OF IRMA M. COLLINS v. BRITTANY C. AMBURN

**Appeal from the Chancery Court for Jefferson County**
**No. 10-3-052     Telford E. Forgety, Jr., Chancellor**

---

**No. E2012-00075-COA-R3-CV - Filed September 28, 2012**

---

Karen Stoner ("the Executrix"), in her capacity as the Executrix of the Estate of Irma M. Collins, brought suit against Brittany C. Amburn seeking to divest ownership of certain real property out of Amburn and into her name in her representative capacity. The suit was grounded in the Executrix's claim that the subject property was fraudulently conveyed to Amburn by the latter's stepfather, Larry C. Collins ("the Judgment Debtor"), a judgment debtor of the Estate. The Executrix alleged that the transfer was made for the purpose of shielding the property from execution on her judgment. At the conclusion of the proof in a jury trial, the court held that no reasonable minds could reach a conclusion other than that the conveyance was fraudulent in nature. The court directed a verdict in favor of the Executrix. The court vested all right, title and interest to the property in the Executrix. Amburn appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

R. Deno Cole, Knoxville, Tennessee, for the appellant, Brittany C. Bradley, formerly Amburn.[1]

---

[1]Ms. Amburn states that she married after this suit was filed and that her married name is "Bradley." For ease of reference, we shall continue to refer to her by her former name, "Amburn," as reflected throughout the record on appeal.

Michael S. Kelley, Kathy D. Aslinger, Briton S. Collins, Knoxville, Tennessee, for the appellee, Karen Stoner.

**OPINION**

I.

In June 2007, Irma Collins, the mother of both the Executrix and the Judgment Debtor, filed a lawsuit against the Judgment Debtor in Ohio.[2] She died on May 31, 2008. The Executrix then prosecuted the Ohio lawsuit to its conclusion.

When he was sued in Ohio, the Judgment Debtor owned a condominium in Knox County ("the Breckenridge property"). In February 2009, the Judgment Debtor offered the Breckenridge property "for sale by owner" and reached an agreement to sell it to sisters, Sue Wells and Patsy Meade ("the Buyers"), for $129,000. On February 12, 2009, the Judgment Debtor conveyed the property to the Buyers by warranty deed, and the Buyers, after making a down payment, executed a note and deed of trust to the Judgment Debtor for $114,000, the remaining balance owed on the sale.

In March 2009, the Judgment Debtor gave his deposition in the Ohio lawsuit. On September 24, 2009, the Ohio court entered a summary judgment against the Judgment Debtor awarding the Executrix $789,276.99 plus statutory interest and costs ("the Ohio judgment").

On November 20, 2009, the Executrix filed suit in Tennessee to register and enforce the Ohio judgment. Three days later, the complaint was served on the Judgment Debtor, who was then living with his wife, Robin Collins ("Robin"), at a house he owned on Eden Lane in Knoxville. Two weeks after that, on December 4, 2009, the property that is the subject of the present case – a modular home and lot located in Knoxville at 2835 Daybreak Way ("the Daybreak Way property") – was purchased.

At trial, John Shelton, sales consultant for the seller, Clayton Homes, testified regarding the sale. The Judgment Debtor along with Robin (collectively "the Collins"), and Robin's daughter, Amburn, were all present at the sale. According to Shelton, the Judgment Debtor was involved "quite a bit." All of the closing documents were completed solely in Amburn's name. Shelton testified that it was a cash deal and the Judgment Debtor carried the money into the room in a cloth bank bag. Shelton recalled that the cash totaled around

---

[2]The record does not reflect the basis of the suit. The gravamen of the complaint is not relevant to the issues on this appeal.

$107,000, and mostly consisted of hundred dollar bills that were in bank wrappers separating them into thousand dollar groupings. The closing documents included a buyer's cash disclosure form which reflected that the transaction was a "true cash" transaction – meaning there was no outside financing source. "Brittany Amburn" was listed on the document as the source of the cash payment. The deed titled the Daybreak Way property in Amburn's name alone. Shelton had no knowledge as to whom the cash belonged.

On February 8, 2010, the Executrix obtained a judgment from the Chancery Court for Knox County registering the Ohio judgment in Tennessee ("the Tennessee judgment"). On March 31, 2010, the Executrix filed suit in this case against Amburn. The suit essentially sought to set aside the conveyance of the Daybreak Way property to Amburn on the ground that it had been fraudulently conveyed to her by the Judgment Debtor. The suit also sought to reform the deed to reflect the Executrix as the property's lawful owner. In response, Amburn denied the essential allegations of the complaint and demanded a jury trial.

In April 2011, the Executrix moved for summary judgment. In response to the Executrix's statement of undisputed facts, Amburn "categorically denied that [Judgment Debtor] purchased the Daybreak Way property." As support, Amburn submitted the Judgment Debtor's June 23, 2011, affidavit in which he denied using the money he obtained from the sale of the Breckenridge property to purchase the Daybreak Way property. Asserting that he contributed "very little" of his own cash, the Judgment Debtor stated in his affidavit that the money to purchase the Daybreak Way property belonged to his wife, Robin, and was mostly funds she received from her father's estate and life insurance proceeds following her father's death in March 2008. The Judgment Debtor denied that he was rendered insolvent by the Daybreak Way property transaction. He contended that he still had most of the proceeds from the Breckenridge property sale. The Judgment Debtor further denied the allegation that Amburn provided no consideration in the Daybreak Way property purchase. He testified that Amburn turned over most of the $8,000 she received from the government as a "first-time home-buyer [sic]" to Robin in exchange for her mother's assistance in purchasing the home. In summary, Amburn contended in her response to the Executrix's complaint that there were disputed facts "as to whether or not proceeds from [the Judgment Debtor], . . . , were used to purchase real property titled in the name of [Amburn]."

The trial court denied the Executrix's motion for summary judgment based on its finding that "there are disputed material questions of fact that must be reconciled by a jury." To that end, the court ordered that the jury would be directed to report its verdict by answering the following question: "Do you unanimously find, by a preponderance of the evidence, that the December 4, 2009 purchase of 2835 Daybreak Way . . . was a fraudulent transfer?"

At the October 27, 2011, trial, the Executrix testified by videotape deposition from Ohio, where she resides with her husband. The Executrix, 64, a retired deli clerk, explained that she was unable to travel to Tennessee for trial because of multiple medical issues. She noted that the Judgment Debtor is her only sibling. She stated they were close to each other and to their mother growing up. In recent years, however, a feud had developed that the Executrix said began in 2004 when the Judgment Debtor initiated a move of their elderly mother from Ohio to Tennessee to live close to him. According to the Executrix, once their mother was in Tennessee, the Judgment Debtor often left her alone for days at a time and would not allow her to call the Executrix. In the Executrix's opinion, the Judgment Debtor attempted to isolate their mother from the rest of the family. In 2006, their mother spent the Thanksgiving and Christmas holidays with the Executrix in Ohio. Soon after, she moved into the Executrix's Ohio home where she remained until her death.

The Executrix testified that she was determined to carry on the proceeding her mother had initiated, including continuing her efforts to collect on the Tennessee judgment. According to the Executrix, the Judgment Debtor had not worked in 20 to 30 years and his only income sources of which she was aware were the VA disability benefits and social security retirement benefits he received. She noted that the Judgment Debtor had once briefly served in the Navy. She stated that he received disability benefits for "anger management" issues.

Sue Wells testified regarding the Buyers' purchase of the Breckenridge property. Wells testified that, in the Fall of 2009, the Judgment Debtor offered to reduce their note by $5,000 – to $124,000 – if the money was paid immediately, within 2 to 3 days, and *in cash*. To complete the transaction, Wells obtained a loan and accompanied the Judgment Debtor to her bank, where the Judgment Debtor received full payment in cash. Wells testified that the Judgment Debtor "put it in his coat pocket and left." Upon further questioning, Wells stated she dealt solely with the Judgment Debtor throughout the transaction.

Amburn testified as the last witness. When the Daybreak Way property was purchased, Amburn was eighteen and unemployed; before and since then, she has been seasonally employed at the Knoxville Zoo and earned $7.25 an hour. She had briefly held various other hourly-wage jobs. Amburn estimated she earned less than $10,000 in 2009. Amburn admitted that the Judgment Debtor contributed "some" of the money used to purchase the Daybreak Way property. *She acknowledged that she had not contributed any of the money*. She said she had no personal knowledge as to how much the Judgment Debtor, her mother, and/or anybody else actually contributed to the purchase. Amburn testified she had not given the Judgment Debtor anything in exchange for the money he contributed, nor had she agreed to make payments to him. Amburn stated that the "only exchange we had over the house was that it was going to be a place that my mother could go and live . . . [in

-4-

the event of] [the Judgment Debtor's] death or a divorce or separation." Initially, Amburn disagreed that the house was actually intended for Robin rather than for her, saying that she, Amburn, lived there and had been "homeless," having slept in her car a few times before the property was purchased. In later testimony, however, Amburn said that, at the time the Daybreak Way property was purchased, she understood "that it wasn't a house for [her] so much as it was a house for [her] mother." Amburn explained that, for this reason, when she and the Judgment Debtor had disagreements, it was she, rather than the Judgment Debtor, who left.

The trial court read Amburn's October 2010 responses to interrogatories into the record. In relevant part, Amburn was asked to state with particularity the source of all funds used to purchase the Daybreak Way property. She answered that "[the Judgment Debtor] and Robin . . . paid for 2835 Daybreak Way. . . ." Asked to state with particularity "[the Judgment Debtor's] involvement in the purchase," Amburn again answered that "[the Judgment Debtor] and Robin . . . paid for 2835 Daybreak Way." Asked why the property was paid for in cash, Amburn answered that "Daybreak Way was paid in cash by a combination of cash from [the Judgment Debtor] and Robin . . . , a portion of which they jointly shared." Significantly, Amburn answered each question "[u]pon information and belief."

Just after the Daybreak Way property was purchased, Amburn and the Collins moved into the house. At that time, the Collins vacated their Eden Lane home and allowed it to go into foreclosure. Amburn testified that her mother told her that "they couldn't afford the payment and that it was too much house for [the Judgment Debtor] and her [at] their age." Amburn admitted that, in an earlier deposition, she instead testified that the Judgment Debtor and Robin left the Eden Lane home in order to avoid making payments on it when there was an outstanding judgment against them. Amburn testified that her only knowledge "of the whole event" was what Robin said after suit was filed.

After purchasing the Daybreak Way property, the Collins furnished the entire home and paid the utility bills. They moved into the master bedroom, while Amburn took another bedroom. Amburn testified she moved out after a few months because she could not afford to take care of the house and the utilities and because she, her mother and the Judgment Debtor did not get along. On cross-examination, she conceded that, in her deposition, she did not mention that she could not afford the bills as a reason she left, but had mentioned only that she and the Judgment Debtor could not get along. She lived with a friend in Knoxville until June 2010, returned to the Daybreak Way property until November, then moved out again. According to Amburn, around the time of her departure, the Judgment Debtor and Robin had also left the Daybreak Way property and began moving around, staying at various motels, in order to avoid the Executrix's lawsuit.

In March 2011, Amburn, her then-fiancee and Robin, who had separated from the Judgment Debtor, moved into the Daybreak Way property, where they remained at the time of trial. Amburn agreed she never paid any utilities or other bills related to the Daybreak Way property until she and her now-husband began living there in 2011. Amburn testified she had never heard of the Executrix, the estate she represented, or the judgment she had against the Judgment Debtor until the present lawsuit was filed. She said the Judgment Debtor had not been back to the Daybreak Way property since he lived there just after its purchase and it was not "his" house; she considered it hers. She denied ever having an agreement to allow the Judgment Debtor to live there at his will.

At the close of the Executrix's proof-in-chief, the Judgment Debtor moved for a directed verdict. Following argument, the court found that "there is plenty enough evidence . . on the [Executrix's] side of the ledger" and denied the motion. After the Judgment Debtor rested without calling any witnesses or offering other proof, the Executrix also moved for a directed verdict. In opposing the motion, Amburn asserted, with little elaboration, that jury questions remained about which reasonable minds could differ. Further, Amburn argued that, through her own testimony, she had "explained away everything" with respect to any indication of fraud presented by the Executrix's proof.

The trial court declined to allow the case to go to the jury, and directed a verdict in favor of the Executrix. In support of its ruling, the trial court found "that reasonable minds could not differ as to the conclusions to be drawn from the evidence" – and that the only reasonable conclusion was that the Judgment Debtor had fraudulently conveyed the Daybreak Way property to Amburn. The court entered judgment in favor of the Executrix and ordered that title to the property be divested out of Amburn and into the Executrix within 10 days from the date of entry of its judgment. Amburn timely filed a notice of appeal.

## II.

Amburn presents a single issue for our review:

> Did the trial court err in granting a directed verdict in favor of the Executrix?

## III.

With respect to directed verdicts, our standard of review is as follows:

> In ruling on such a motion, the standard applied by both the trial court and the appellate court is the same as that applied to a

motion for directed verdict made during trial. Therefore, the trial court and appellate court are required to take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion when there is any doubt as to the conclusions to be drawn from the evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Usher v. Charles Blalock & Sons, Inc.*, 339 S.W.3d 45, 57 (Tenn. Ct. App. 2010) (citing *Mercer v. Vanderbilt University, Inc*., 134 S.W.3d 121, 130-31 (Tenn. 2004)(citations omitted)).

A trial court's decision to grant a motion for directed verdict is a question of law. *Underwood v. HCA Health Servs. of Tennessee, Inc*., 892 S.W.2d 423, 425 (Tenn. Ct. App. 1994). This Court reviews questions of law de novo with no presumption that the trial court decided them correctly. *S. Constructors, Inc. v. Loudon Co. Bd. of Educ*., 58 S.W.3d 706, 710 (Tenn. 2001); *Green v. Moore*, 101 S.W.3d 415, 418 (Tenn. 2003); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

IV.

A.

Amburn challenges the grant of directed verdict. She challenges the trial court's finding that the evidence reasonably leads only to the conclusion that the transfer of the Daybreak Way property to her was fraudulent. Amburn contends that the court, in order to find that no reasonable mind could reach any other conclusion, necessarily failed to take the strongest legitimate view of the evidence in her favor. She argues that the court erred in failing to construe the evidence in her favor and by failing to disregard all countervailing evidence. Stated differently, Amburn contends that allowing the case to go to the jury "could have resulted in the Court ruling that a fraudulent transfer did not occur." The Executrix responds that the trial court's judgment is supported by undisputed evidence of both actual and constructive fraud and should be affirmed.

As previously noted, the trial court granted the Executrix a directed verdict at the close of the proof. It did so pursuant to Tenn. R. Civ. P. 50.01. The Rule provides as follows:

A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case.

The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

En route to its ruling, the court stated, in part:

THE COURT: I am . . . leaning toward a directed verdict. The evidence here is undisputed. [The Judgment Debtor] got $108,000.00 in cash. [The Judgment Debtor] took $107 - whatever the purchase price on this property - - [the Judgment Debtor] took it in himself. He was, if not the main moving force in buying the house, he was involved - - I forget the witness's exact words, but involved to a great degree.

Then you have all these badges of fraud, which I'm telling you, they are right here, every one of them, and there is no explanation offered. [Amburn] just says, "Look, I don't know, I don't know." On top of that, you have [Amburn] in her own deposition saying, look, mother and [the Judgment Debtor] stopped paying on the Knoxville house and let it go into foreclosure because they didn't want to continue to pay the debts and bills associated with it when they were going to get a big judgment against them and just lose it.

\* \* \*

Now, if you can tell me what other conclusion could a reasonable mind draw, Mr. Cole? There is no question. There is no question but that [the Judgment Debtor] contributed. There is no question but that he contributed . . . to the purchase of this property. And there is no evidence that anybody else did.

[Mr. Cole, Counsel for Amburn]:   Yes, there is, your Honor.

*   *   *

It is in the Interrogatories, [Amburn] stated that Robin Collins contributed as well.  That is in evidence.

THE COURT: Oh, I remember it.

*   *   *

State with particularity the source of all the funds used to purchase 2835 Daybreak Way, . . . .   Upon information and belief, [the Judgment Debtor] and Robin Collins paid for 2835 Daybreak Way, which [Amburn] believes to total $109,000.00.

Explain why . . . Daybreak Way was purchased with cash.  Upon information and belief, Daybreak Way was paid in cash by a combination of cash from [the Judgment Debtor] and Robin Collins, of course, . . . which they jointly secured.

Mr. Cole, the motion is granted.  The motion is good.  The badges of fraud, the Court's opinion, no reasonable mind could differ.  I . . . thought about reserving judgment on the motion and going ahead and submitting the matter to the jury, but, no, the motion . . . is good upon the evidence here.  There is just no reasonable mind could reach any other conclusion.  There is just too much, just too much. . . .

In addition to its oral pronouncement, the trial court made additional pertinent findings as follows:

The [Judgment Debtor] . . . used One Hundred Seven Thousand Dollars ($107,000), in cash for the purchase of [the Daybreak Way property].

[The Executrix] became a creditor of Judgment Debtor before the purchase of . . . [the Daybreak Way property].

Judgment Debtor did not receive from . . . [Amburn] anything of an equivalent value in exchange for his purchase of . . . [the Daybreak Way property].

Judgment Debtor was insolvent or rendered insolvent as a result of the purchase of [the Daybreak Way property].

With respect to the nine (9) "badges of fraud" identified by the Court in its previous findings, [Amburn] has not carried her burden of providing proof of an explanation for these suspicious circumstances.

B.

Our analysis of the trial court's grant of a directed verdict begins with a review of the statutory requirements for establishing a claim for a fraudulent conveyance. Tennessee's version of the applicable law – the Uniform Fraudulent Transfer Act – is codified at Tenn. Code Ann. § 66-3-301, et seq. (2004) ("UFTA"). The Act delineates two types of fraudulent transfers – the first applies to a debtor's present and future creditors and involves actual fraud, while the second applies only to present creditors and addresses constructive fraud. *See* Tenn. Code Ann. §§ 66-3-305(a)(1), 66-3-306(a)(2004). Various remedies are available to an affected creditor. *See* Tenn. Code Ann. § 66-3-308.[3] Under the UFTA, a "transfer" is defined, with respect to both statutes, as including "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Tenn. Code Ann. § 66-3-302(12). In the instant case, there is no dispute that a transfer took place with respect to the Daybreak Way property. Taking the statutes in turn, we thus consider whether the transfer was fraudulent.

C.

In order to establish a claim of a fraudulent transfer pursuant to Section 66-3-305(a)(1), it must be shown that the transfer was made with the "actual intent to hinder, delay, or defraud any creditor of the debtor." In making this determination, the courts are guided by a consideration of the following factors, including whether

---

[3]In its final judgment, the trial court stated that the parties in the present case agreed in a pre-trial conference that divesting title of the Daybreak Way property out of Amburn and into the Executrix was the proper remedy if a fraudulent transfer was established.

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305(b). The record reflects that the court considered the evidence regarding each of the above-cited statutory factors and expressly found (with the exception of factor eleven, which it held was inapplicable in the present case) the existence of every factor tending to establish actual fraud on the Judgment Debtor's part. We quote pertinent portions of the court's ruling elaborating as to certain factors:

> Number 3: The transfer or obligation was disclosed or concealed. The Court finds that the titling of the property in . . . Amburn's name was indeed an attempt to conceal the transfer.

-11-

Number 5: The transfer was of substantially all the [D]ebtor's assets. The Court believes that factor is present here. Again[,] the transferor here, [Judgment Debtor], had let a house in Knoxville go into foreclosure and lose it specifically in an attempt to try to avoid losing it toward payment of this [judgment] debt which he already owed.

Number 6: The debtor absconded. That factor is present here. [Judgment Debtor] wasn't here at any time in this lawsuit . . . .

Number 7: The debtor removed or concealed assets. The court finds that factor is present here. You get $109,000.00 in cash, cash cash, on the sale of a house . . . there is nothing illegal about that, but it is extremely unusual, and then you turn around a short period of time later and you buy another house with cash cash for $107,000.00 and title it in somebody else's name, the Court concludes that was an attempt to conceal the assets.

Number 8: The value of the consideration received by the debtor was reasonably equivalent. Here [Judgment Debtor] didn't receive anything of value other than a promise, oral promise, not included in the title papers . . . that . . . Robin . . . would have a place to live.

The burden is on the plaintiff to prove that a particular transfer is fraudulent. The finding of fraud is based upon the facts and circumstances of each case and is typically proven by circumstantial evidence. *Nadler v. Mountain Valley Chapel Bus. Trust*, No. E2003-00848-COA-R3-CV, 2004 WL 1488544, at *2 (Tenn. Ct. App. E.S., filed June 30, 2004) (citing *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986)). In addition to the above-cited statutory factors, circumstantial evidence may come in the form of "badges of fraud" – circumstantial indicators used by the courts to perceive a debtor's intent for fraudulent transfer purposes. Badges of fraud have been described as "any fact[s] that throw[] suspicion on the transaction and call[] for an explanation." *Macon Bank,* 715 S.W.2d at 349. Tennessee courts have identified the following badges of fraud:

1. The transferor is in a precarious financial condition.

2. The transferor knew there was or soon would be a large money judgment rendered against the transferor.

3. Inadequate consideration was given for the transfer.

4. Secrecy or haste existed in carrying out the transfer.

5. A family or friendship relationship existed between the transferor and the transferee(s).

6. The transfer included all or substantially all of the transfer's nonexempt property.

7. The transferor retained a life estate or other interest in the property transferred.

8. The transferor failed to produce available evidence explaining or rebutting a suspicious transaction.

9. There is a lack of innocent purpose or use for the transfer.

*Nadler,* at *2 (citing *In re Hicks*, 176 B.R. 466, 470 (Bankr. W.D. Tenn. 1995)); *Stone v. Smile*, E2009-00047-COA-R3-CV, 2009 WL 4893563, at *5 (Tenn. Ct. App. E.S., filed Dec. 18, 2009). "The presence of one or more of the badges of fraud gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant." *Id*. (citing *Macon Bank*, 715 S.W.2d at 349).

Here, the trial court expressly found that all nine "badges of fraud" were present. We agree. On our review, we conclude that the presence of the statutory factors set forth in Section 66-3-305(b) as well as each of the common law badges of fraud amount to overwhelming, circumstantial indicators of the Judgment Debtor's "actual intent to hinder, delay, or defraud" his creditors, the Executrix in particular. In considering the badges of fraud, the trial court further observed, in relevant part:

> The lack of an innocent purpose for the transfer. Another big thing here, there is absolutely no explanation offered for any of this, no explanation. [Amburn] - - And let me say this. I do not mean to lay any of this at [Amburn's] door. [. . . .]. There is no evidence, no evidence, that she was culpable personally in any way. I think this was a scheme of [the Judgment Debtor] and, unfortunately, [Amburn] got caught up in it.

And then, . . . : The transferor's failure to offer evidence explaining away the suspicious nature of the transfer. Again, [the Judgment Debtor] is not even here, not been here at any time in connection with this lawsuit.

Robin [ ] is not here. She has not been here at any time . . . . She wasn't here at the trial today.

There is absolutely no explanation offered here. [. . . .]. Too many badges of fraud, too many facts. The fact that [the Judgment Debtor] asked for the cash [from the Buyers of the Breckenridge property], asked for it early, by the way, asked for it early, got it early upon condition that it would be paid in cash. And then shortly thereafter turned around and took a large sum of money, $107,000.00, in a cloth bag, all but the last $2,000 of it still bearing the bank bands, and paid for this house.

Just too many, . . . too many things to be explained away. You just couldn't . . . he just didn't, he couldn't explain them away.

Again, "[w]here the circumstances of a transfer of property by a debtor are suspicious, the failure of the parties to testify or to produce available explanation or rebutting evidence is a badge of fraud.*" Union Bank v. Chaffin*, 24 Tenn. App. 528, 147 S.W.2d 414 (1940). In the instant case, proof of the existence of every applicable statutory factor and numerous badges of fraud surround the transfer of the Daybreak Way property. The relevant facts thus "threw the burden of going forward with proof of an explanation on the [Judgment Debtor]." *Macon Bank and Trust Co. v. Holland*, 715 S.W.2d at 349. No such proof was forthcoming. Accordingly, the evidence supports the conclusion that a fraudulent transfer was conclusively shown. More significantly in the context of the Executrix's motion for directed verdict, we conclude that there were no evidence upon which a jury could base any other conclusion.

D.

We next consider whether the transfer of the Daybreak Way property is properly deemed fraudulent under Tenn. Code Ann. § 66-3-306(a). That Section provides as follows:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or

-14-

incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Thus, the elements required to establish a claim of a constructively fraudulent transfer are:

1) The creditor's claim arose before the transfer;
2) The debtor did not receive a reasonably equivalent value; and
3) The debtor was insolvent or rendered insolvent by the transfer.

Tenn. Code Ann. § 66-3-306(a); *Stone v. Smile*, 2009 WL 4893563 at *4.

As set out earlier in this opinion, the trial court expressly found that each element was proven at trial. First, as Amburn concedes, there is no question that the first element exists; the Executrix became a creditor of the Judgment Debtor before the Daybreak Way property was purchased. The second element focuses on the value of the consideration the Judgment Debtor received in exchange for the transfer. Amburn argues that there is a disputed issue of fact "about the exact amount [the Judgment Debtor] contributed, if any," to the purchase of the Daybreak Way property. We disagree. At trial, Amburn admitted that the Judgment Debtor had contributed "some" of the $107,000 plus purchase money. Further, the proof showed that the purchase was made with cash that the Judgment Debtor supplied soon after the Judgment Debtor received around $109,000 in cash from his sale of the Breckenridge property. While Amburn stated in her interrogatory response, "upon information and belief" – rather than personal knowledge – that the purchase was made by both the Judgment Debtor and Robin, she produced no evidence at trial of any other source of the money other than the Judgment Debtor. On the evidence before us, no disputed issue of fact exists as to whether the money was contributed by the Judgment Debtor. All of it was contributed by him.

This leads us to consider whether the Judgment Debtor received anything of "reasonably equivalent value" in return for the $107,000 plus he expended. Amburn insists that the court failed to consider that the Judgment Debtor received "something" from Amburn in exchange for the transfer – that is, the Judgment Debtor "received a promise that [wife Robin] would receive a place to live" if the Judgment Debtor died or she and the Judgment Debtor separated. To the contrary, the trial court found that the Judgment Debtor received nothing of value from Amburn in exchange for the purchase and transfer of the property other than "a promise, oral promise, not included in the title papers . . . that . . . Robin . . . would have a place to live." At trial, Amburn conceded that she contributed nothing toward the purchase of the property, nor did she give the Judgment Debtor a deed

-15-

of trust for the property, exchange anything of value, or promise him any payment in the future. The UFTA expressly provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, *but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."* Tenn. Code Ann. § 66-3-304(a) (emphasis added). Moreover, the official comments to the same section make clear that value is to be determined from the perspective of the creditor whereby it is stated that "[c]onsideration having no utility from a creditor's viewpoint does not satisfy the statutory definition." Certainly, Amburn's promise to allow her mother to live in her home is of no value to the Executrix or any other of the Judgment Debtor's creditors.

Lastly, the trial court found that the Judgment Debtor was insolvent or rendered insolvent by the purchase of the Daybreak Way property. Section 66-3-303(a) of the UFTA provides that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." With entry of the judgment stemming from the Ohio lawsuit, the Judgment Debtor was indebted to the Executrix alone for at least $789,276.99. There was evidence showing that, from February 2009 through August 2011, the Judgment Debtor never maintained a bank account balance over $10,000, and, many times, it was considerably less. In fact, in several months, the records reflected a negative account balance and the bank's imposition of overdraft fees. The evidence showed that the Judgment Debtor received income in the form of disability benefits that totaled some $4,000 a month; no other evidence of any income source was presented. In addition, the Judgment Debtor had owned two properties – Eden Lane and the Breckenridge property; the first was foreclosed upon and the second sold. No other evidence of any assets of the Judgment Debtor was presented. Amburn testified that the Judgment Debtor and Robin had allowed their Eden Lane home to go into foreclosure and began moving from motel to motel in an effort to avoid payment of the judgment. In short, Amburn's contention that a jury may have reasonably concluded that the Judgment Debtor owned assets other than those reflected in his bank account records is most unpersuasive; such a finding would amount to nothing more than pure conjecture as there was no basis for such a finding in the evidence. In our view, the evidence overwhelmingly preponderates in favor of the finding of a constructively-fraudulent transfer, to the exclusion of any other conclusion.

V.

In summary, if, from all of the evidence, there is a reasonable basis for disagreement among reasonable persons as to whether the Judgment Debtor fraudulently transferred the property, then the question is one for the jury. Given the evidence before us, we conclude that there is but one, inescapable conclusion to be drawn from the evidence at trial – the

Judgment Debtor's transfer of the Daybreak Way property to Amburn was fraudulent pursuant to both Tenn. Code Ann. § 66-3-305(a) and § 66-3-306(a). Accordingly, the trial court did not err in granting the Executrix a directed verdict.

VI.

The judgment of the trial court is affirmed. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed below. Costs on appeal are taxed to the appellant, Brittany C. Bradley.


_____
CHARLES D. SUSANO, JR., JUDGE